**MAV FREIGHT SERVICE, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 75–C–767.**

United States District Court, E. D. New York.

Aug. 18, 1978.

504

Piken & Piken, Flushing, N. Y., for plaintiff; Robert W. Piken, Flushing, N. Y., of counsel.

David G. Trager, U. S. Atty., Eastern District of New York, Brooklyn, N. Y., for defendant; Prosper K. Parkerton, Asst. U. S. Atty., Brooklyn, N. Y., John A. DiCicco, Trial Atty., Tax Div., Dept. of Justice, Washington, D. C., of counsel.

BARTELS, District Judge.

Plaintiff, Mav Freight Service, Inc. ("Mav") seeks a refund of $9,863.10 together with interest in withholding and Federal Insurance Contributions Act ("FICA") taxes paid for the calendar year 1969. The taxes were assessed on amounts paid by Mav to a number of individuals for work performed in unloading shipments of beef delivered in the metropolitan New York area.

I

Mav is a New York corporation engaged in the freight trucking business, and in 1969 was involved in the delivery of beef and

other meat products shipped from slaughterhouses in the midwest to consignees in the New York area. This beef was packed and sealed by shippers in railroad owned "piggyback" trailers which were then placed on flatbed railroad cars and consigned for delivery to processing warehouses in the metropolitan New York area. Mav was one of the companies retained by shippers to transport these "piggyback" trailers from the receiving railroad yards to the consignees' warehouses.

Upon dispatching a loaded trailer, a shipper would notify Mav by phone of the name of the shipment's consignee and the time and place of arrival of the train carrying the "piggyback" trailer. Upon arrival, Mav would be notified by the railroad as to the trailer's availability for pick-up.

Rather than maintaining a fleet of tractors large enough to handle the hundred or more trailers arriving each week, Mav contracted with individuals who owned and operated tractors to make the deliveries. Upon arrival of a trailer, Mav would contact one of these owner-operators and instruct him as to when and where to make the pick-up and delivery. Although Mav utilized a number of different owner-operators during 1969, most of its deliveries were limited to two or three owner-operators. Mav itself owned two tractors, and on occasion, Mav's general manager would also make deliveries. The service which Mav provided included not only delivery of the loaded trailers to their respective consignees, but also included unloading of the trailers at the consignees' warehouses, and return of the empty trailers to the railroad yards at which they were picked up.

In order to perform the unloading portion of its service, Mav authorized owner-operators to engage, from time to time, unloaders on Mav's behalf, and to obligate Mav to pay them. These unloaders were uncommitted individuals who hung around in the vicinity of the consignees' warehouses looking for work. They were available to work not only on Mav trucks but on any truck and, as a tractor-trailer neared the warehouse, would approach it and offer their unloading services. The price of this service for unloading swinging beef in 1969 was $30 or $35 a trailer, and was non-negotiable, being the same regardless of which unloader was hired. Generally, a driver would hire the first unloader to reach his truck, whether by virtue of a scramble between the unloaders, or the informal rotation system which prevailed at some warehouses. Although this was the common practice, a driver was free to hire a particular unloader with whom he was familiar. In some instances, Mav contacted unloaders with whom it had dealt previously, to arrange to have them available to unload its trailers at a particular time and location.

After engaging an unloader, a driver waited until the consignee had assigned him a dock at which to unload his trailer. When an unloading dock was assigned, the driver would back his trailer to the dock and the driver, or the unloader under his supervision would break the seal on the trailer, allowing unloading to proceed. In order to unload a trailer of swinging beef, an unloader had to remove the beef forequarters and hindquarters from the hooks on which they were hung, and carry them to hooks suspended from rails on the unloading dock. To facilitate the handling of these sides of beef, each of which weighed between 180 and 220 pounds, unloaders made use of hand held meat hooks which they supplied themselves at a cost of $2 to $3. During unloading, unloaders were required, pursuant to federal regulations, to wear white coats and gloves. Some of the unloaders who worked for Mav supplied their own coats and gloves, while others made use of garments which consignees' employees had used and placed in receptacles for dirty laundry.

At some warehouses, a single unloader was permitted to unload a full trailer of swinging beef. At other warehouses, consignees required at least two unloaders to work on a trailer. Regardless of whether more than one unloader was required, or whether unloaders decided among themselves to share the work of unloading a particular trailer, the driver made the un-

loading arrangement with a single individual, and paid only the flat rate of $30 to $35 per load.

Although unloading forequarters and hindquarters of beef requires a combination of strength and agility, no significant amount of skill is required, and an unloader could become proficient in a month or less. An inexperienced or careless unloader might cause damage to a side of beef by dropping it or improperly inserting his hook through the more valuable cuts, but in general this was rare and any damage was slight.

The speed at which the unloaders worked was controlled by the speed at which the consignees' employees worked. Unloaders could only bring beef out to the dock if hooks were available to hang it on, and this depended on factors such as the consignees' need for a particular cut at a particular moment and the pace at which consignees' employees moved the beef off the dock and into the warehouse. When consignees' employees took coffee breaks and lunch breaks, unloaders were not permitted to continue unloading and had to adjust their schedules accordingly. Because unloaders could not determine the pace at which the trailers were unloaded, they could not profit through the use of any management skills. Similarly, when two or more unloaders worked together on a load, they divided the flat rate payment evenly, and thus neither profited from the other's work.

Although the drivers were free to supervise the unloading process, the general level of experience among the unloaders and the fact that the pace of unloading was set by consignees' employees made it unnecessary for Mav's drivers to exercise such supervision over the unloaders they hired. As a result, while trailers were being unloaded, owner-operators were able to rest in the cabs of their tractors, or even leave the trailer and return to the railroad yard if necessary to obtain additional trailer loads. However, if at any time it appeared to the driver that an unloader was doing his job improperly, the driver had the right to discharge him.

As a general matter, when an unloader had completed his job, the driver would then pay the unloader in cash. Although this was the manner in which payments were made by most trucking companies, the method used by Mav was somewhat different. On some occasions, Mav did provide its drivers with cash for paying unloaders. More commonly, though, Mav would not pay unloaders in cash but would instead issue Mav checks to its owner-operators with which to pay the unloaders, or authorize the drivers to obligate Mav to make a single lump-sum payment to an unloader for all of the work he had done during an entire week. As a result of this deferred payment system, some unloaders were unwilling to work on Mav trucks. A number of unloaders, however, did work for Mav on a fairly regular basis between 1967 and 1969. At the end of each week, one or more of these unloaders would go to Mav's business office to receive a check for the week's work or would receive such a check in the mail. At times, the check for all of Mav's unloading at a single location would be issued in the name of one of the unloaders who regularly worked for Mav. This unloader in turn would then divide the amount of the check with the other unloaders, each taking a share proportionate to the number of Mav loads he had unloaded that week. These payments were made by Mav out of its own funds, and Mav subsequently included the cost of unloading in its bills to shippers on a dollar-for-dollar basis.

## II

■ The jurisdiction over Mav's claim for refund is based upon 28 U.S.C. § 1346(a)(1). The taxes which it seeks to recover were collected pursuant to the FICA and withholding tax provisions of the Internal Revenue Code, 26 U.S.C. §§ 3101 et seq. and 26 U.S.C. §§ 3401 et seq., respectively. The assessment of FICA and withholding taxes against Mav was based upon names appearing on checks paid to the unloaders and petty cash receipts received from them by Mav. Mav has the burden of proving not only that the assessment against it was

erroneous, but also the amount of overpayment. *Helvering v. Taylor,* 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935).

█ For purposes of FICA taxes, 26 U.S.C. § 3121(d)(2) provides that the term "employee," for whom an employer must make contributions, includes "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee." Similarly, the determination of whether an individual is an "employee" for purposes of withholding taxes is determined by factors, such as control over the details and means by which work is accomplished, which determine whether an individual is an employee at common law. *See* 26 C.F.R. § 31.3401(c)–1; *Lanigan Storage & Van Co. v. United States,* 389 F.2d 337 (6th Cir. 1968).

█ Thus, we must examine the common-law rules. At common law, a variety of factors must be considered in determining whether an employer-employee relationship exists. No single factor is controlling, and each case depends upon its own particular facts. *Bartels v. Birmingham,* 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947). A number of courts have applied common-law principles to determine the employment status of unloaders and have reached conflicting conclusions, finding them to be employees in some situations, *McGuire v. United States,* 349 F.2d 644 (9th Cir. 1965); *Service Trucking Co. v. United States,* 347 F.2d 671 (4th Cir. 1965), and independent contractors in others, *Lanigan Storage & Van Co. v. United States, supra; Bonney Motor Express, Inc. v. United States,* 206 F.Supp. 22 (E.D.Va. 1962). In evaluating the facts before us, we are guided by the common-law standard as articulated in *Avis Rent A Car System, Inc. v. United States,* 503 F.2d 423 (2d Cir. 1974). In *Avis,* 503 F.2d at 429, the

Court of Appeals analyzed the Supreme Court's opinions in *United States v. Silk,* 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947), and *Bartels v. Birmingham, supra,* and concluded that at least seven factors were relevant to such a determination at common law, as follows:

1) If the person receiving the benefit of a service has the right to control the manner in which the service is performed, the person rendering the service may be an employee.

2) If a person rendering a service has a substantial investment in his own tools or equipment, he may be an independent contractor.

3) If a person performing a service undertakes a substantial cost, say by employing and paying his own laborers, he may be an independent contractor.

4) If a person performing a service has an opportunity to profit depending on his management skill, he may be an independent contractor.

5) If a service rendered requires a special skill, the person rendering it may be an independent contractor.

6) If the relationship between a person rendering a service and the person receiving it is permanent, it may be an employment relationship.

7) If a person rendering a service works in the course of the recipient's business, rather than in some ancillary capacity, he may be an employee.

As the Court of Appeals recognized, this list is not exhaustive, *Avis, supra,* 503 F.2d at 429, n. 3, and other factors may also be relevant.[1]

█ We recognize that this is a borderline case and that the relevant factors must be closely scrutinized. One of the most important factors to be considered in deter-

---

1. Among these additional factors are:

   1) the manner of payment, whether by the job or on an hourly basis;

   2) the right to discharge at will;

   3) the offering of services to the general public rather than to one individual;

   4) whether a distinct occupation or recognized calling is involved; and

   5) the custom in the trade.

*See Bonney Motor Express, Inc. v. United States,* 206 F.Supp. 22, 26 (E.D.Va.1962); Restatement (Second) of Agency § 220 (1958); 56 C.J.S. Master and Servant § 3(2), at 45, *et seq.*

mining the existence of the employer-employee relationship at common law is the employer's right to control not only the result to be accomplished, but also the manner and the details and means by which that result is reached. *See United States v. Silk, supra,* and 26 C.F.R. § 31.3401(c)–1. In this case, the evidence amply demonstrates that Mav's drivers had a right to choose their unloaders, supervise the details of their unloading, and discharge them at will. The fact that the unloaders were generally experienced at their relatively simple task and could work only at the pace set by consignees' employees seldom made it necessary for Mav's drivers to exercise their right to control. However, it is the existence of that right, rather than its exercise, which is of significance in establishing the employer-employee relationship. As the court in *McGuire v. United States, supra,* observed in finding unloaders to be employees:

> The nature of the unloaders' work is such that little supervision is necessary. Because unloaders are paid by the job rather than on a time basis, it is to their economic advantage to work rapidly and efficiently. Rapid and efficient handling is taxpayer's only interest in the unloaders' work. . . . The absence of need to control should not be confused with the absence of right to control. The right to control contemplated by the Regulations relevant here and the common law as an incident of employment requires only such supervision as the nature of the work requires.

349 F.2d at 646.

We also note that the unloaders had no substantial investment in tools or equipment. The unloaders' meat hooks cost only $2 or $3 and any additional outlay by those who supplied their own gloves and white gowns was minimal. Similarly, none of the unloaders here undertook the cost of employing others, but simply divided the work and the $30 or $35 payment equally when more than one unloader was required on a single trailer. Unlike formally organized unloading companies, which were in a position to profit from rapid and efficient handling of the loads and from employing and deploying individuals to do the actual unloading work, the unloaders at issue here could work only at the pace dictated by others and were paid for and could profit only by their own individual labor.

■ Another factor to be weighed is the absence of any significant skill required to unload beef, a task in which unloaders were able to become proficient in two to three weeks. The unloading was not merely ancillary to Mav's business but was an integral part of its delivery service. The fact that Mav could not allocate a profit to this portion of its operation does not alter the status of the unloaders employed to perform this essential function.

Furthermore, there was more than a transient relationship between Mav and the unloaders involved in this case. Unlike *Lanigan Storage & Van Co. v. United States, supra,* and *Bonney Motor Express, Inc. v. United States, supra,* in which over-the-road truck drivers had contact only once or twice a year with unloaders who were held to be independent contractors, Mav's owner-operators had contact with the same unloaders several times each week. There was a permanency in Mav's relationship with its unloaders as evidenced by the method of payment of compensation, by a weekly check picked up at Mav's office or mailed to the unloaders' homes. Although this was not the custom in the trade, as indicated by the unwillingness of some unloaders to work for deferred payment on Mav trucks rather than the cash payments made by others, this was the method chosen by Mav and is consistent with an employer-employee relationship.

■ Applying these criteria in light of the spirit and intent of the statute to bring within the umbrella of its protection as many workers as possible, we conclude that the unloaders engaged by Mav were its employees.

In reaching this conclusion, we have not ignored the fact that the unloaders were paid on a per job rather than an hourly basis, pointing to the status of independent

contractors. However, in view of the fact that Mav's central objective and obligation was to have its trailers unloaded quickly and efficiently, and that it was the unloaders' obligation to do this rapidly in order to receive payment, under these circumstances the method of payment was comparable to that for piece work employees, and such means of compensation does not render the unloaders independent contractors. *See, e. g., Bringardner Lumber Co. v. Middleton,* 276 Ky. 247, 124 S.W.2d 52 (1939); 56 C.J.S. Master and Servant § 3(8), at 59–60. We have also considered the fact that the unloaders offered their services to other truckers, but find that in the factual context of this case, such a fact alone does not demonstrate that the unloaders were independent contractors. *See, e. g., White v. J. R. Watkins Co.,* 1 Wash.2d 466, 96 P.2d 456 (1939). *But cf. Bonney Motor Express v. United States, supra* (unloaders' availability to the general public tends to negate employer-employee relationship).

Although the relationship between Mav and the unloaders does not satisfy all of the common-law tests for finding them to be Mav's employees, the totality of the evidence and criteria do support that conclusion. Accordingly, we find that Mav has failed to meet its burden of proving that the assessment against it was erroneous. The Commissioner's determination that the unloaders were Mav's employees must therefore be sustained, and judgment for defendant entered accordingly.

The foregoing constitute this court's findings of fact and conclusions of law, as called for by Fed.R.Civ.Proc. 52(a).

SO ORDERED.