CITY OF CINCINNATI, Appellant,

v.

SCHEER & SCHEER DEVELOPMENT;

Jindal Builders & Restoration Corporation, Appellee.

[Cite as *Cincinnati v. Scheer & Scheer Dev.*, 169 Ohio App.3d 101, 2006-Ohio-1221.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–050336.

Decided March 17, 2006.

Julia L. McNeil, City Solicitor, and Terrance A. Nestor, Assistant City Solicitor, for appellant.

W. Kenneth Zuk, for appellee.

MARK P. PAINTER, Judge.

{¶ 1} Plaintiff-appellant, the city of Cincinnati, challenges the trial court's grant of summary judgment to defendant-appellee Jindal Builders and Restoration Corporation. The trial court had overruled a magistrate's findings that the city's financing of a development project in the Findlay Market neighborhood was not a public improvement.

{¶ 2} But the city's control over the contractor was tantamount to a principal-agency relationship. The city's control of financing, possible share of profits, and implementation of city hiring and employment policies established the redevelopment project as a public improvement. We thus hold that the trial court did not err in granting summary judgment and awarding $244,036.44 to Jindal Builders.

## I. Redeveloping Over-the-Rhine

{¶ 3} The city of Cincinnati and Scheer & Scheer Development Corporation signed a loan agreement in the summer of 2002 for the redevelopment of housing around Findlay Market in Over-the-Rhine. The city had owned eight parcels of property—buildings that were boarded up, dilapidated, and full of trash. The city wanted to keep the property as residential units and bring the units up to occupancy standards under the city building codes.

{¶ 4} The city transferred these properties to Scheer & Scheer for $1. In return, Scheer & Scheer was to redevelop the property. In the agreement, the city was to put 100 percent of the money into the first phase of the project, and Scheer & Scheer gave a mortgage back to the city for $1,072,523. Scheer & Scheer was to invest $2.78 million of its own capital in the project. A subcontractor for Scheer & Scheer would be reimbursed only after properly submitting an invoice and a payroll report for the work completed. This agreement was authorized by a city ordinance.

{¶ 5} The city provided complete contractual oversight. The city retained the authority to approve all subcontractors and plans, provided all construction standards and requirements, and imposed city policies for small-business-enterprise programs, equal-employment-opportunity programs, and prevailing-wage rates. The city also had inspectors on the job every day to approve all work. When the project was completed, the city was to share in the profits upon the sale of the completed units. Obviously, the "profits" section was wishful thinking.

{¶ 6} The first stage of the two-part project was the stabilization phase. Jindal Builders was the low bidder. As the subcontractor for this phase, Jindal Builders was to clean up the properties and to repair or replace structural defects such as floor joists, brick work, and roofing. The city allocated $767,120.87 for the first stage. This money was to be the only source of funds for the initial phase of the development.

{¶ 7} As the project progressed, cost overruns became apparent. The amount of restoration far exceeded the estimates set forth in the bid specifications. For instance, in one building, 120 board feet of floor joists were to be replaced. But once the joists were fully exposed, over 400 board feet needed to be replaced. Because of these cost overruns, Scheer & Scheer abandoned the project in the fall of 2003.

{¶ 8} In September 2003, Jindal notified the city that Scheer & Scheer was not paying its invoices, which Jindal had believed Scheer & Scheer was submitting to the city. But it seems that these invoices never made their way from Scheer & Scheer to the city. After not being paid for its work by Scheer & Scheer, Jindal filed mechanics' liens on the properties. The city then initiated foreclosure

actions upon the properties and the lien holders of the properties. One of the lien holders, Jindal, filed a cross-claim for a lien on public funds against the city under R.C. 1311.25 through 1311.38.

{¶ 9} Eventually, the magistrate found that the project was not a public improvement because the city was not an owner of the property. Jindal objected to the magistrate's report, and the trial court rejected the report, finding that this indeed was a public improvement. The court entered judgment in favor of Jindal and against the city for $244,036.44.

## II. Summary–Judgment Standard

{¶ 10} We review summary-judgment determinations de novo, without deference to the trial court's ruling.[1] Summary judgment should be granted only when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can only come to a conclusion adverse to the nonmoving party, when viewing the evidence in the light most favorable to the nonmoving party.[2] A party moving for summary judgment bears the initial burden of demonstrating that no genuine issue of material fact exists, and once it has satisfied its burden, the nonmoving party has a reciprocal burden to set forth specific facts showing that there is a genuine issue for trial.[3]

## III. How Is a Subcontractor Paid When the Principal Contractor Abandons the Project?

{¶ 11} As the Seventh Appellate District in *Miller–Yount Paving, Inc. v. Freeman Cargo Carrier, Inc.* has pointed out, a public-improvement project typically involves a contract between a public authority and a principal contractor.[4] Often certain work and materials called for under the contract are the responsibility of subcontractors. Subcontractors work or furnish materials for the project under a contract not with a public authority, but with the principal contractor.

1. See *Doe v. Shaffer* (2000), 90 Ohio St.3d 388, 738 N.E.2d 1243.

2. Civ.R. 56(C); *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 364 N.E.2d 267.

3. See *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264.

4. *Miller–Yount Paving, Inc. v. Freeman Cargo Carrier, Inc.* (Mar. 30, 2000), 7th Dist. No. 98 C.A. 226, 2000 WL 341125.

{¶ 12} Thus subcontractors lack privity of contract with the public authority itself.[5] In order to ensure payment, R.C. 1311.25 through 1311.38 protect subcontractors. These statutes "afford a species of garnishment to protect the subcontractor against the risk of loss of the payments properly due him should they reach his principal contractor in whose hands they may be subject to the latter's creditors or to his own caprice."[6]

{¶ 13} Under R.C. 1311.26, a subcontractor who has performed labor or work or has furnished material for any public improvement under a contract with the principal contractor may serve the public authority with an affidavit stating the amount due and unpaid for the labor and work performed and material furnished, and thereby obtain a lien on the funds.

{¶ 14} In the present case, Jindal was a subcontractor for Scheer & Scheer. Jindal performed the work to clean up the properties and to repair or replace the structural defects. After it was not paid, Jindal used R.C. 1311.25 through 1311.38 to place notice of a lien on public funds.

### IV. What Is a Public Improvement under R.C. 1311.25?

{¶ 15} The city's first assignment of error claims that because it was not the owner of the property being redeveloped, there was no "public improvement" as defined by R.C. 1311.25. For Jindal to be able to collect on a lien against public funds, the work performed must be part of a public improvement. To understand the city's argument, we must turn to the plain language of the statute:

{¶ 16} " 'Public improvement' means any construction, reconstruction, improvement, enlargement, alteration, demolition, or repair of a building, highway, drainage system, water system, road, street, alley, sewer, ditch, sewage disposal plant, water works, and any other structure or work of any nature by a public authority."[7]

{¶ 17} The redevelopment project was to be an improvement of eight buildings in Over–the–Rhine. Because the first element of the statute was met, we turn to the second element of the statute: what is a "public authority"? Under the statute, " '[p]ublic authority' includes the state, and a county, township, municipal corporation, school district, or other political subdivision of the state, and any public agency, authority, board, commission, instrumentality, or special district of

---

5. Id.

6. Id., citing *Lee Turzillo Contracting Co. v. Cincinnati Metro. Hous. Auth.* (1967), 10 Ohio St.2d 5, 9, 39 O.O.2d 3, 225 N.E.2d 255.

7. R.C. 1311.25(A).

or in the state or a county, township, municipal corporation, school district, or other political subdivision of the state, and any officer or agent thereof."[8]

{¶ 18} Thus, while the city is a "public authority" for the purposes of R.C. 1311.25, it contends that the eight parcels of property could not be viewed as a public improvement because it did not own the parcels—Scheer & Scheer did. The city maintains that Scheer & Scheer simply obtained financing (through the city) and hired contractors to improve its own property. When Scheer & Scheer defaulted, the city believes, Jindal's appropriate recourse was with Scheer & Scheer. The city's argument is flawed.

{¶ 19} Under R.C. 1311.25(B), "public authority" includes not only a municipal corporation such as the city but also an agent of the municipal corporation. It is here that the city's argument suffers.

{¶ 20} The city has maintained that it was merely like any other lending agency, simply providing "seed money to revitalize the Findlay Market neighborhood." But the city was not merely a lending agency. In fact, as part of the contract between the city and Scheer & Scheer, the city was to share in the profits when the buildings were sold. The sharing of profits thus negates the city's argument that it was merely a lending institution. Instead, we find an appropriate analogy in agency theory.

### V. The City Had Control

{¶ 21} The Ohio Supreme Court has stated: "The relationship of principal and agent or master and servant is distinguished from the relationship of employer and independent contractor by the following test: Did the employer retain control, or the right to control, the mode and manner of doing the work contracted for? If he did, the relationship is that of principal and agent or master and servant. If he did not but is interested merely in the ultimate result to be accomplished, the relationship is that of employer and independent contractor."[9] Indeed, in agency, the question of respondeat superior often rests on the amount of control the employer has retained.

{¶ 22} But the Ohio Supreme Court has also noted in *Hanson v. Kynast* that the degree of control necessary to establish agency has not been clearly defined.[10] Instead, courts have generally examined various factors in determin-

---

8. R.C. 1311.25(B).

9. *Councell v. Douglas* (1955), 163 Ohio St. 292, 56 O.O. 262, 126 N.E.2d 597, paragraph one of the syllabus.

10. *Hanson v. Kynast* (1986), 24 Ohio St.3d 171, 175, 24 OBR 403, 494 N.E.2d 1091, citing Restatement of the Law 2d, Agency (1958) 485, Section 220.

ing whether the requisite amount of control exists. Some of the factors include (1) whether the individual was performing in the course of the principal's business rather than in some ancillary capacity,[11] (2) whether the individual was receiving any compensation from the principal,[12] (3) whether the principal supplied the tools and the place of work in the normal course of the relationship,[13] (4) whether the individual offered his service to the public at large or to one individual at a time,[14] (5) the length of employment,[15] and (6) the right to terminate the employee at will.[16]

{¶ 23} We find an analogous case from the Minnesota Supreme Court, *Jenson Farms v. Cargill*,[17] where farmers brought suit against Cargill, Inc. and Warren Grain & Seed Company to recover losses sustained when Warren defaulted on the contracts made with the farmers for the sale of grain. Cargill provided financing for Warren's grain-elevator operation. But as Warren's debts increased, Cargill increasingly took control over the mode and manner of operations.[18] The Minnesota Supreme Court noted that Cargill's control included (1) a right of entry to carry on audits, (2) financing all of Warren's purchases of grain and operating expenses, (3) power to discontinue the financing of Warren's operations, (4) Warren's inability to enter into contracts without Cargill's approval, and (5) Cargill's almost daily business recommendations.[19] The "parental" guidance that Cargill had provided Warren convinced the court that the creditor-debtor relationship had transformed into a principal-agent relationship because of the de facto control that Cargill exerted over the conduct of Warren.

{¶ 24} We recognize that some of the elements listed by the Ohio Supreme Court in *Hanson* and the Minnesota Supreme Court in *Jenson* are found in ordinary creditor-debtor relationships. But when these factors are viewed in

---

11.  Id., citing *Avis Rent A Car System v. United States* (C.A.2, 1974), 503 F.2d 423, 429.

12.  Id., citing *Youngblood v. Morrison Grain Co.* (D.La.1978), 467 F.Supp. 758, 761, affirmed (C.A.5, 1979), 591 F.2d 1207.

13.  Id., citing *Gradler v. Prudential Property & Cas. Ins. Co.* (D.Pa.1979), 464 F.Supp. 575, 578; *Mav Freight Serv., Inc. v. United States* (D.N.Y.1978), 462 F.Supp. 503, 507.

14.  Id., citing *Bonney Motor Express, Inc. v. United States* (D.Va.1962), 206 F.Supp. 22.

15.  Id., citing *Mav Freight Serv., Inc. v. United States* (D.N.Y.1978), 462 F.Supp. 503.

16.  Id., citing *Gradler v. Prudential Property & Cas. Co.* (D.Pa.1979), 464 F.Supp. 575.

17.  *A. Gay Jenson Farms Co. v. Cargill, Inc.* (Minn.1981), 309 N.W.2d 285.

18.  Id. at 287–288.

19.  Id. at 291.

light of all the circumstances surrounding the control the city exerted over Scheer & Scheer, we are persuaded that the city overstepped its role as a creditor and entered into a principal-agent relationship.

{¶ 25} The city provided complete contractual oversight over the eight parcels of property that Scheer & Scheer was redeveloping. The city retained the authority to approve all subcontractors and plans, provided all construction standards and requirements, and imposed city policies for small-business-enterprise programs, equal-employment-opportunity programs, and prevailing-wage rates. The city also had inspectors on the job every day to approve the work. When the project was completed, the city was to share in the profits upon the sale of the renovated buildings. The extent of this control over the project leads us to conclude that the city was not merely a lending agency.

{¶ 26} By controlling not only the financial allocations but also the mode and manner of the work to be performed, the city crossed the line from being merely a lending agency. Through its actions, the city in effect transformed the redevelopment project of Scheer & Scheer into a public improvement authorized by a public authority.

{¶ 27} Thus, we conclude that Jindal Builders properly filed a lien against public funds. The trial court did not err in determining that the Scheer & Scheer redevelopment project financed and controlled by the city of Cincinnati was a public improvement.

## VI. Amount of Lien Awarded

{¶ 28} The city's second assignment of error contests the trial court's determination of the lien amount. The city maintains that because Scheer & Scheer was not entitled to additional funds under the contractual terms, Jindal could not recover.

{¶ 29} Under R.C. 1311.28, upon receiving an affidavit claiming an amount due and unpaid for work performed, a public authority should "detain from the principal contractor or from the balance of the funds remaining in the contract" the amount of the subcontractor's claim. If the principal contractor fails to serve the public authority with written notice of an intention to dispute the claim within 20 days, the statute presumes that the principal contractor has assented to the affidavit's correctness.[20]

{¶ 30} In the present case, in September 2003, Jindal notified the city that Scheer & Scheer was not paying its invoices. Jindal later filed mechanics' liens on the properties. When the city initiated foreclosure actions upon the proper-

---

20. R.C. 1311.31.

ties, Jindal filed a notice of lien on public funds against the city under R.C. 1311.25 through 1311.38.

{¶ 31} No party has disputed the amount of labor performed. Both agree that Jindal performed labor and provided materials in the stabilization phase of the project. Additionally, under R.C. 1311.31, when Scheer & Scheer failed to dispute the amount of these claims, it assented to the correctness of the claims.

{¶ 32} Jindal had submitted seven pay requests prior to the work in question, and all seven had been approved and paid by the city. The pay requests in question were pay requests numbers 8 to 11. The work for these pay requests was completed and totaled $244,036.44. Jindal had submitted these pay requests to Scheer & Scheer before it abandoned the project. Scheer & Scheer simply failed to submit these requests to the city.

{¶ 33} As R.C. 1311.32 indicates, "a public works lien operates on, and only on, the fund[s] due or to become due to the principal contractor." [21] Additionally, " 'if there is no such fund due or to become due from the public body to the principal contractor * * * there is nothing to which the lien may attach.' " [22]

{¶ 34} The city maintains that it was not obligated to release further funds under the contract because Scheer & Scheer had defaulted. So we are left with the question whether Scheer & Scheer was due funds for the stabilization phase before defaulting on the contract. The city believes that Scheer & Scheer was owed nothing because it had failed to submit Jindal's pay requests. But that argument is specious.

{¶ 35} The important words to focus on here are "funds due or *to become due* to the principal contractor." (Emphasis added.) From a factual standpoint, all that was needed to approve the pay requests was a signature from Scheer & Scheer and the forwarding of the requests to the city. The city still maintained an account of $428,261.74 for the stabilization phase of the contract, more than enough to cover the $244,036.44 lien on public funds by Jindal. We conclude that since the funds were to become due upon the signature of Scheer & Scheer, the city should not have been able to defeat Jindal's lien on public funds. The nonfeasance by Scheer & Scheer should not have unfairly compromised Jindal's claim—this is exactly the situation the statute exists to cover.

---

**21.** *Miller–Yount Paving, Inc. v. Freeman Cargo Carrier, Inc.* (Mar. 30, 2000), 7th Dist. No. 98 C.A. 226, 2000 WL 341125. See, also, 68 Ohio Jurisprudence 3d (1986) 313, Mechanic's Liens, Section 232.

**22.** *Miller–Yount Paving, Inc.*, supra, quoting 68 Ohio Jurisprudence 3d (1986) 313, Mechanic's Liens, Section 232.

{¶ 36} The city should not be able to have its cake and eat it too. The city has reacquired the property and has benefited from the materials and labor provided by Jindal. Since there was no dispute as to the amount of the claim, we find no error in the trial court's award of $244,036.44 to Jindal.

{¶ 37} Accordingly, we overrule the city's assignments of error and affirm the trial court's grant of summary judgment.

Judgment affirmed.

DOAN, P.J., and GORMAN, J., concur.