**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 18a0542n.06

**No. 17-4207**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

<table>
<tr><td>THERMO CREDIT, LLC,</td><td>)</td><td rowspan="9"><strong>FILED</strong><br>Oct 29, 2018<br>DEBORAH S. HUNT, Clerk<br><br>ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO</td></tr>
<tr><td style="padding-left:2em">Plaintiff-Appellant,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>v.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>DCA SERVICES, INC.,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td style="padding-left:2em">Defendant-Appellee.</td><td>)</td></tr>
</table>

**BEFORE:** **GIBBONS, STRANCH, and BUSH, Circuit Judges.**

**JULIA SMITH GIBBONS, Circuit Judge.** Thermo Credit, LLC ("Thermo Credit") filed suit against DCA Services, Inc. ("DCA"), seeking to avoid and recover payments DCA received from one of Thermo Credit's debtors because Thermo Credit claimed those payments were fraudulent transfers under the Ohio Uniform Fraudulent Transfer Act ("OUFTA"). The district court granted summary judgment for DCA and Thermo Credit appealed. A large portion of the payments Thermo Credit seeks to recover were subject to a valid lien and are thus exempt from OUFTA's purview. As to the other payments, we conclude that Thermo Credit has waived its right to bring suit to recover them. We therefore affirm the judgment of the district court.

I.

There are three relevant entities in this case: Plaintiff-Appellant Thermo Credit, Defendant-Appellee DCA, and the now-defunct Communications Options, Inc. ("COI").[1] Thermo Credit is

---

[1] "Communications Options, Inc." and the "COI" abbreviation actually refer to three separate entities: Communications Options, Inc., Communications III, Inc., and Telecom Ventures, LLC. Communications Options, Inc. and Telecom Ventures, LLC were wholly owned subsidiaries of the parent company Communications III, Inc.

a lender that provides funding to technology and communications companies. COI was a full-service telecommunications provider, which in 2010, borrowed approximately $990,000 from Thermo Credit pursuant to a Loan and Security Agreement. DCA is a telecommunications software development company that, in 2012, considered purchasing COI. However, DCA decided not to purchase the company after realizing that COI had a substantial amount of debt in relation to its assets and therefore had no value. Instead of purchasing the company, DCA decided to enter into a business relationship with COI in which DCA would take over COI's management and operations.

In February 2012, DCA and COI entered into a Managed Services Agreement (the "Original MSA"), where DCA agreed to accept "management control and responsibility for all assets, liabilities, customers, personnel, facilities, revenue and expenses" and to "appoint a Chief Restructuring Officer who will undertake the complete management and operation of the Business." DE 37-2, Original MSA, Page ID 1424. Jeff Swenson, a vice president at DCA, was appointed the chief restructuring officer. In exchange for its services, DCA would receive 40% of the net profits generated by COI and monthly payments "equal to 20% of the net improvement to the Business's Balance Sheet during the month." *Id.* The Original MSA did not provide for minimum monthly payments.

By April 2012, however, DCA wanted to end its relationship with COI because it doubted its own ability to restructure COI successfully and did not think it would be able to make a profit from the company. According to Swenson, DCA's threat to withdraw prompted COI to offer to renegotiate the relationship. Apparently, COI was concerned that if DCA terminated the

---

The entities are referred to collectively as "Communications Options, Inc." because they operated as one business with consolidated financial statements.

relationship, COI would lose CenturyLink, its most important vendor that represented 70% of the company's revenue. The leadership at COI therefore asked DCA if there was a way the two companies could continue the relationship so DCA could help with the CenturyLink issue. After Swenson discussed the matter internally with DCA, DCA agreed to keep managing COI in exchange for minimum monthly payments.

In accordance with their renegotiated relationship, on May 9, 2012, COI and DCA entered into a new Service Agreement, and later that month, they entered into a Supplemental Agreement (collectively, the "First Service Agreement"). Under the First Service Agreement, COI agreed to pay DCA a minimum monthly fee of $35,000. The parties executed yet another agreement on February 1, 2013, incorporating their prior agreements but making the following additions: (1) DCA assumed extra responsibilities "including Provisioning, Customer Services, Collections, Carrier Reconciliation, Revenue Assurance, and general administrative support," and (2) the minimum monthly fee was increased to $55,000 per month. DE 37-2, Amendment One, Page ID 1435. Shortly thereafter, on May 20, 2013, Swenson and others from DCA decided to take COI into Chapter 11 bankruptcy to "shed the massive vendor debts that ha[d] accumulated over the years." DE 33, Swenson Dep., Page ID 361 (5/22/2013 Email).

After filing for bankruptcy, COI moved for an order authorizing it to use cash collateral so it could continue operating its business. COI asked the bankruptcy court to afford Thermo Credit adequate protection of Thermo Credit's interests as a secured creditor[2] "by granting Thermo Credit a replacement lien in Cash Collateral generated by the post-petition operation of the Debtor's

---

[2] Once a debtor files for bankruptcy, the debtor's property becomes property of the estate and an automatic stay is placed on said property. 11 U.S.C. §§ 541(a), 362. The bankruptcy court's approval is required to lift the stay on property, including cash collateral. *Id.* § 363. Any entity with an interest in property of the estate may object or condition the use of cash collateral "as is necessary to provide adequate protection" of the entity's interest. *Id.* § 363(e).

business, to the extent of any valid and subsisting liens or interest held by it in Cash Collateral as of the Petition Date." DE 37-9, Bankruptcy Filings, Page ID 1701. The bankruptcy judge entered an interim order on May 23, 2013 permitting COI to use cash collateral and granting Thermo Credit liens in all post-petition property of COI. On June 17, 2013, the bankruptcy judge entered a final order authorizing COI to use cash collateral on a limited basis and granting Thermo Credit "valid, automatically-perfected, and unavoidable first-priority liens and security interests in and on all of the Debtor's and Debtor-in-Possession's assets." *Id.* at 1744, 1751.

By the fall of 2013, DCA was "told that COI would like to take back accounting and finance," and COI hired its own accountant, David Gearhart. DE 48, Huang Dep., Page ID 2734–35. COI and DCA executed another Service Agreement (the "Second Service Agreement") in October 2013, which reduced the minimum monthly payment to $51,000. That same month, Swenson left DCA and became a full-time employee of Communications Options, Inc. COI and DCA subsequently amended the Second Service Agreement three times. The December 1, 2013 Amendment did not change the minimum monthly payment or the services that DCA would provide. However, the April 1, 2014 Amendment stated that DCA would no longer provide human resources or tech support services and reduced the minimum monthly payment to $46,000. The September 1, 2014 Amendment further lowered the minimum monthly payment to $32,500.

By the fall of 2014, COI discovered that the financial statements that it had been providing to the bankruptcy court were inaccurate and had been manipulated by Gearhart, meaning that the company was in worse financial condition than its leadership realized. On November 21, 2014, COI filed a voluntary motion to dismiss the bankruptcy. Swenson resigned from COI in December 2014. On January 15, 2015, COI sent a letter notifying DCA that it was ceasing to provide

telecommunications services. At the time COI terminated its relationship with DCA, it had paid DCA $1,595,315.43. Thermo Credit subsequently foreclosed on all of COI's tangible assets.

Thermo Credit then initiated the instant case, seeking, pursuant to OUFTA, to avoid and recover the monthly payments COI made to DCA. It later moved to amend its complaint to add a cause of action for actual fraud under O.R.C. § 1336.04(A)(1). Both parties moved for summary judgment, and Thermo Credit also moved to strike certain evidence DCA had attached to its summary judgment motion. The district court granted DCA's motion for summary judgment and denied Thermo Credit's motion. It also denied Thermo Credit's motions to amend its complaint and to strike evidence as moot.

The district court granted summary judgment to DCA for two primary reasons. First, it held that none of the payments COI made to DCA after May 2013 (when COI filed for bankruptcy) qualified as fraudulent transfers under OUFTA, because property is not considered an "asset" under OUFTA "to the extent it is encumbered by a valid lien" and Thermo Credit had a first-priority lien in all of COI's cash pursuant to the bankruptcy judge's May 2013 order; thus, none of the payments made after this order qualified as "transfers of assets." O.R.C. § 1336.01(B). However, the court found that the *pre*-May 2013 payments did qualify as "transfers of assets," because it concluded that DCA had "not put forth evidence proving that Thermo Credit had a lien on COI's cash until May 20, 2013." DE 60, Op. & Order, Page ID 3083; *see* O.R.C. § 1336.05. Nonetheless, the district court still granted summary judgment to DCA because it concluded that Thermo Credit had failed to establish a genuine issue of material fact as to whether COI received less than reasonably equivalent value for the pre-May 2013 payments.

II.

Thermo Credit argues that the district court improperly granted summary judgment to DCA for two reasons. First, it argues that the court erroneously held that the post-May 2013 payments were not "transfers of assets," claiming that its lien on Thermo Credit's cash would have been extinguished when the money was transferred to DCA. Second, Thermo Credit argues that the district court incorrectly applied the law requiring value to be "concrete and quantifiable" when determining that the payments were received for reasonably equivalent value. DCA counters that summary judgment was appropriate because none of the payments were "transfers of assets" under OUFTA's definition of "asset," and they were all received in exchange for services of reasonably equivalent value. It also proposes that we affirm on alternate grounds by finding that Thermo Credit waived its right to complain about the payments, an argument that the district court did not address.

We review a district court's decision to grant summary judgment *de novo*. *Simpson v. Ernst & Young*, 100 F.3d 436, 440 (6th Cir. 1996). Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact." *Mosholder v. Barnhardt*, 679 F.3d 443, 448 (6th Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." *Id.* at 448–49 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) and Fed. R. Civ. P. 56(e)).

III.

The payments made before the bankruptcy court's May 2013 order granting Thermo Credit a first-priority lien in all of COI's assets and those made after the May 2013 order fall into two different categories for purposes of legal analysis. We address the pre-May 2013 payments first.

A.

Both O.R.C. § 1336.04 and § 1336.05 require that the debtor make a "transfer" (or "incur an obligation," which is not relevant here). A "transfer" is "every direct or indirect, absolute or conditional, and voluntary or involuntary method of disposing of or parting with an *asset* or an interest in an *asset*." O.R.C. § 1336.01(L) (emphases added). Whether the payments were transfers therefore depend on whether the COI's cash was an "asset." The statute defines "asset" as "property of a debtor," but it specifically excludes "[p]roperty to the extent it is encumbered by a valid lien." O.R.C. § 1336.01(B)(1). And finally, a "valid lien" is defined as "a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings." O.R.C. § 1336.01(M). The district court held that only the post-May 2013 payments were not "transfers of assets" because DCA had "not put forth evidence proving that Thermo Credit had a [valid] lien on COI's cash until May 20, 2013." DE 60, Op. & Order, Page ID 3082–83. Thermo Credit argues that the district court erred in holding that the lien granted by the bankruptcy court qualifies as a "valid lien" that would exempt the payments from OUFTA's definition of "assets." We disagree.

B.

A valid lien is one "that is effective against the holder of a judicial lien subsequently obtained." O.R.C. § 1336.01(M). Here, the bankruptcy court's grant of "first-priority liens and security interests" in COI's assets, including its cash, would certainly have been "effective against

the holder of a judicial lien subsequently obtained"—otherwise, the bankruptcy court's order would have provided no real protection to Thermo Credit's interests as a secured creditor.

The Bankruptcy Code "sets forth a basic system of priority, which ordinarily determines the order in which the bankruptcy court will distribute assets of the estate." *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 979 (2017). By granting Thermo Credit "first-priority liens" in all of COI's assets, the bankruptcy court ensured that Thermo Credit would be paid from the estate first, before any of COI's other creditors—including creditors holding "subsequently obtained" judicial liens. Consequently, the bankruptcy court's order gave Thermo Credit a lien over COI's assets—including its cash—that would be "effective against the holder of a judicial lien subsequently obtained." Therefore, the post-May 2013 payments were encumbered by a valid lien and are outside the purview of OUFTA.

Thermo Credit argues that the post-bankruptcy payments were not encumbered by a valid lien because under Ohio's version of the Uniform Commercial Code ("UCC"), cash or funds from a deposit account are generally transferred free of security interests. *See* O.R.C. § 1309.332. So, Thermo Credit claims, when COI made the payments to DCA, Thermo Credit's encumbrances vanished. However, this argument is unpersuasive. Thermo Credit is correct that DCA *took* the payments free of its security interest. That is, once the money had been transferred to DCA, Thermo Credit no longer had any claim to those funds. But the fact that DCA took the payments free of Thermo Credit's interest does not mean that they were free of encumbrances *at the time of payment*. As long as the cash remained in COI's possession, it was still subject to Thermo Credit's first-priority lien.

Furthermore, according to OUFTA's definition of "asset" as "property of a debtor," O.R.C. § 1336.01(B), the payments to DCA could only be assets if they belonged to COI at the time of

transfer, *i.e.*, if they were COI's "property." This seems obvious. But in arguing that the payments were free of encumbrances, Thermo Credit asks us to look at whether the property was encumbered after the transfer—and thus after it had ceased being COI's property. We decline to view the payments as COI's property for one purpose but as DCA's property for another purpose. The proper time to evaluate whether the property was encumbered is prior to the transfer, when it was in COI's possession and control. And Thermo Credit acknowledges that "COI's deposit accounts and funds were encumbered by a security interest while they were in the hands of COI." CA6 R. 24, Appellant Br., at 24. Therefore, the payments made to DCA after May 2013 were encumbered by a "valid lien" and are not covered by OUFTA.[3] We affirm the district court's grant of summary judgment as to those payments.

## IV.

We also agree with the district court that DCA did not show that Thermo Credit had a valid lien on COI's cash until the bankruptcy court's May 2013 order.[4] Thus, those payments made before May 2013 fall within OUFTA's reach. However, we still affirm the district court's grant

---

[3] Thermo Credit argues that affirming the district court here would inhibit creditors' ability to bring fraudulent transfer claims "because any cash or deposit account subject to a security interest would be out of reach." CA6 R. 21, Reply Br., at 9. This argument misses the point. "The Ohio UFTA's overall purpose is to discourage fraud and provide aggrieved creditors with a means to recover assets *wrongfully placed beyond their reach*." *In re Fair Fin. Co.*, 834 F.3d 651, 674 (6th Cir. 2016) (emphasis added). OUFTA does not apply to property subject to a valid lien presumably because its drafters made the reasonable assumption that such property is at lower risk of being fraudulently transferred, since a secured creditor with a valid lien will be able to protect its interests using the powers available to it as a secured creditor.

[4] There is no court order explicitly granting Thermo Credit a first-priority interest in COI's cash and deposit accounts before May 2013, so we turn to the Ohio UCC to determine whether Thermo Credit had a "valid lien" on COI's cash during this time period, *i.e.*, whether it had a lien "effective against the holder of a judicial lien subsequently obtained." O.R.C. § 1336.01(M). According to Ohio law, in order for a lien to "be effective" against a judicial lien, the lienholder's security interest must be perfected. *Comer v. Calim*, 716 N.E.2d 245, 249 (Ohio Ct. App. 1998). There is no evidence in the record that Thermo Credit fulfilled the Ohio UCC's technical requirements for perfection of its security interest in COI's cash and deposit accounts. Thus, DCA has not made a showing that Thermo Credit had a valid lien on the payments before May 2013.

of summary judgment as to the pre-May 2013 payments, although we do so on alternate grounds. Namely, we conclude that Thermo Credit waived its right to challenge those payments.

Both before the district court and on appeal, DCA argued that Thermo Credit waived its ability to challenge the payments in a lawsuit because it did not object to the payments at the time that COI was making them. Looking only to evidence of the parties' knowledge and actions before the May 2013 order, we agree with DCA. Our conclusion is based on the following facts from the record: first, Thermo Credit definitively knew about the payments and had more or less open access to information about COI's finances; second, it suspected that the payments may have been too high; third, it never raised any meaningful objections, attempted to stop the payments, or threatened legal action; and fourth, DCA was prejudiced by Thermo Credit's failure to object in a timely manner.

## A.

"[W]aiver is a voluntary relinquishment of a known right." *Engleson v. Unum Life Ins. Co. of Am.*, 723 F.3d 611, 622 (6th Cir. 2013) (internal quotation marks and citation omitted). In Ohio, "[a] 'waiver' can be found in a great variety of circumstances." *Mark-It Place Foods, Inc. v. New Plan Excel Realty Tr., Inc.*, 804 N.E.2d 979, 1000 (Ohio Ct. App. 2004). Ohio recognizes a version called "waiver by estoppel," which "exists when the acts and conduct of a party are inconsistent with an intent to claim a right, and have been such as to mislead the other party to his prejudice and thereby estop the party having the right from insisting upon it." *Id.* In these cases, the party "neglect[ed] to insist upon [its] right at the proper time." *Motz v. Root*, 4 N.E.2d 990, 991 (Ohio Ct. App. 1934). "Waiver by estoppel allows a party's inconsistent conduct, rather than a party's intent, to establish a waiver of rights." *Nat'l City Bank v. Rini*, 834 N.E.2d 836, 840 (Ohio Ct. App. 2005). Thus, we need only find that Thermo Credit's actions were "inconsistent

with an intent to enforce its rights." *Id.* While the record contains some evidence that Thermo Credit had the intent to relinquish its right to the payments, at the very least there is no dispute of material fact regarding Thermo Credit's actions, which were highly inconsistent with an intent to enforce its rights as a secured creditor.

B.

We turn first to Thermo Credit's knowledge about COI's finances in general and about the payments specifically. While waiver by estoppel does not require proof of intent to relinquish a right, the party must still know that it *has* a right; *i.e.*, Thermo Credit must have been aware that COI was making the payments and have had sufficient information to determine whether they were too high. Only if Thermo Credit had this information could it have reasonably been expected to take action to protect its interests as a secured creditor.

It is undisputed that Thermo Credit knew COI was making the payments to DCA. On February 10, 2012, Seth Block, the executive vice president of Thermo Credit, received an email from Scott Halliday, COI's president at the time, about DCA's managed services offer with the Managed Services Agreement attached. About one month later, Halliday sent an email to Block confirming that COI had entered into the Managed Services Agreement.

Moreover, Thermo Credit had access to COI's financial information and was able to monitor the company. Block testified in his deposition that before COI went into bankruptcy in 2013, Thermo Credit sent auditors to COI "once or twice a year." DE 34, Block Dep., Page ID 491, 615. Block further admitted that Thermo Credit's board required it "to have control of cash over every client," and in fact Block sent an email on May 2, 2011 in reference to COI stating, "[C]ontrol of cash is key here." *Id.* at 630; DE 34-1, 5/2/2011 Block Email, Page ID 800.

Swenson stated that he provided Thermo Credit with monthly financial statements "[d]uring DCA's engagement" and that he "spoke to [Block] fairly regularly." DE 33, Swenson Dep., Page ID 249. Huang confirmed that monthly cash flow spreadsheets were sent to Thermo Credit. Additionally, Thermo Credit increased its level of oversight when COI defaulted on its loan in 2012, as Block acknowledged when he testified that clients in default were subject to extra monitoring. For example, Thermo Credit sent Halliday a notice in April 2012 that Thermo Credit would be conducting due diligence. And while Thermo Credit did not have total control of COI's cash, Block estimated that at least after it sent COI a notice of default in February 2012, sixty percent of COI's cash was in an account controlled by Thermo Credit.

Finally, the record indicates that not only did Thermo Credit know about the payments, it was concerned about their amount. Block testified that in December 2014, "[w]e concluded that DCA was being overpaid for the services that COI was receiving . . . . I don't know that I could say from day one of the relationship, but certainly for an extended period of time." DE 34, Block Dep., Page ID 494. He also stated that even before December 2014, "there were times where we wondered whether they were paying them a lot of money and were they getting that value." *Id.* at 492.

## C.

Having established that Thermo Credit had sufficient information to determine whether the monthly payments were excessive at the time that they were being paid—and that it actually suspected the payments *were* excessive—we now turn to Thermo Credit's actions. In order to conclude that Thermo Credit has waived its claim by estoppel, we must first decide whether its actions were "inconsistent with an intent to claim a right." *Mark-It Place Foods, Inc.*, 804 N.E.2d at 1000. The record reveals that Thermo Credit's actions were entirely inconsistent with its current

position. It chose not to get involved in COI's operations, foreclose on COI's assets, or assert its rights as a secured creditor. Instead, it sanctioned COI's relationship with DCA and stood by while COI made the monthly payments without raising any meaningful objection.

Block stated that Thermo Credit "didn't look into the operations of [COI] . . . . [as long as] we were given a budget that showed that they had sufficient cash, that our debt was being serviced, and that it was satisfactory to the U.S. trustee, we didn't have much of a complaint." DE 34, Block Dep., Page ID 562. He reiterated this policy of avoidance several times, testifying that "it wasn't our position to try to dictate what the company was doing at that point," *id.* at 492, and "I wasn't going to make a decision about [operations]," *id.* at 605. We find the following exchange from Block's deposition particularly telling:

> Q: And you don't want one of your clients paying a vendor some unreasonable amount; right? That's poor cash control?
> A: Well, we don't know what's—we don't know what is a—the wrong amount. It's not our decision—we don't negotiate their contracts and it's not our decision to what they pay their vendors. What our consideration is is [sic] are their assets keeping up with their liabilities.
> Q: And as long as that's happening, you don't care what they're paying?
> A: It's not my say-so.

*Id.* at 635–36. Block also admitted that he received an email from Halliday about the Original MSA but did not think Thermo Credit "had the right to tell COI that [it] didn't think that a managed services agreement was a good idea" because the MSA was part of "the operational side" of the company. *Id.* at 601. In fact, Block never even responded to the email. Nor did he take advantage of Halliday's proffered phone call to discuss the MSA in more detail. In fact, COI gave Thermo Credit permission to speak with DCA and become more involved in the relationship, but Block still declined to "get into the details of what they were providing and how that service worked and operations." *Id.* at 605.

Thermo Credit therefore actively decided not to educate itself on COI's relationship with DCA or become involved in negotiations about the monthly payments. And even though there were apparently suspicions that the payments were too high, Thermo Credit took no real action. In fact, Swenson testified that, "[Block] wanted [the payments] to be lower, I wanted them to be lower, and we made them lower, but he never objected to the payment after the fact." DE 33, Swenson Dep., Page ID 251. Swenson perceived DCA's relationship with Thermo Credit as "cordial"; he recalled COI being "complimented by [Block] on a number of occasions for the— for the frequency and transparency of the communications that we provided." *Id.* at 252. Swenson appears to have viewed himself and Block as collaborators who were both trying to lower the monthly payments to DCA, and Block provided no testimony to the contrary.

Based on actions taken by Thermo Credit, therefore, DCA believed that it supported the relationship with COI; while it may have wanted the payments to be lower, Thermo Credit gave no indication that it believed they were grossly disproportionate to the value COI was receiving. Further, once COI was in default, Thermo Credit could have foreclosed on COI's assets according to the terms of its security agreement. However, Thermo Credit did not exercise its foreclosure rights when COI defaulted in 2012, choosing instead to allow the company to proceed—and to proceed with its relationship to DCA. This is highly significant, since Thermo Credit sent COI the default notice in February 2012, and the First Service Agreement that provided for a minimum monthly payment was executed in May 2012, three months after COI defaulted. So even though COI had defaulted on its loan, Thermo Credit acquiesced to the minimum monthly payments without threatening foreclosure or other legal action, or insisting that the payments be lowered.

In summary, Thermo Credit did not assert its rights as a secured creditor. It did not give any indication to DCA that it believed there was something legally problematic with the payments.

It did not foreclose on COI. In short, it "neglect[ed] to insist upon [its] right at the proper time." *Motz*, 4 N.E.2d at 991.

D.

Next, we ask whether DCA was prejudiced by Thermo Credit's failure to challenge the payments at the time COI made them. *See PHH Mortg. Corp. v. Ramsey*, 17 N.E.3d 629, 634 (Ohio Ct. App. 2014) ("Waiver by estoppel exists when the acts and conduct of a party are inconsistent with an intent to claim a right, and have been such as to mislead the other party to his prejudice and thereby estop the party having the right from insisting upon it." (alterations, internal quotation marks, and citation omitted)). Here, COI's bankruptcy proceeding—the standard forum to resolve disputes between creditors—is over. Instead, Thermo Credit has forced DCA to defend itself in this lawsuit that could have been prevented if Thermo Credit had insisted that the payments be stopped or lowered at the time COI was making them. In fact, Block stated that had Thermo Credit insisted that COI terminate the agreements with DCA, he would have done so, although "not without first explaining what the cost of that to COI would have been." DE 33, Swenson Dep., Page ID 251. Thermo Credit was far from powerless at the time COI was making the payments, especially since COI was in default; nevertheless, it failed to object and led DCA to believe that it approved of the company's relationship with COI. On the rare occasion that Thermo Credit got involved with DCA, it behaved in a collaborative, rather than adversarial, fashion.

Also, throughout COI's relationship with DCA, Thermo Credit was paid every month—from March 2012 to October 2014, COI paid Thermo Credit $636,212. It seems likely that the reason for this, at least in part, is that DCA enabled COI to stay in business at a time when the company was floundering. Thermo Credit therefore arguably benefitted from the monthly

-15-

payments that it now seeks to recover via litigation. We have no trouble concluding that DCA was prejudiced by Thermo Credit's actions.

V.

We are not persuaded by Thermo Credit's arguments against waiver. It primarily argues that we should not hold its actions against it because it could not stop the payments or interfere with the COI-DCA relationship without incurring "lender liability." "Lender liability" stems from agency law and holds a creditor liable for its debtor's activities if the creditor exerts sufficient supervision and control over the debtor's operations. *See* Restatement (Second) of Agency § 14O (Am. Law Inst. 1958). In *City of Cincinnati v. Scheer & Scheer Development*, the Ohio Court of Appeals found the city of Cincinnati had "overstepped its role as a creditor and entered into a principal-agent relationship" with the developer Scheer & Scheer by taking over "the mode and manner of operations" of the developer's business. 862 N.E.2d 122, 126–27 (Ohio Ct. App. 2006). It considered the following facts as proof of the city's supervision and control:

> The city provided complete contractual oversight over the eight parcels of property that Scheer & Scheer was redeveloping. The city retained the authority to approve all subcontractors and plans, provided all construction standards and requirements, and imposed city policies for small-business-enterprise programs, equal-employment-opportunity programs, and prevailing-wage rates. The city also had inspectors on the job every day to approve the work. When the project was completed, the city was to share in the profits upon the sale of the renovated buildings.

*Id.* at 127.

Based on the Ohio court's interpretation of the lender liability doctrine, Thermo Credit would not have run a serious risk of incurring lender liability were it to insist on more proof that the payments to DCA were justified, or even to stop the payments. The city in *Scheer* exerted almost complete control over every aspect of the debtor's business and was heavily involved in its day-to-day operations. Merely objecting to one specific recurring expense or insisting on more

justification for that expense would not rise to anywhere near the level of supervision and control the city exercised in *Scheer*. Additionally, COI was in default on its loan beginning in 2012, so it would not be unusual for Thermo Credit to take more aggressive measures to protect its interest.

Secured creditors sometimes must walk a fine line, but Thermo Credit's attempt to justify its approval of the payments as an attempt to avoid lender liability does not ring true. Thermo Credit is a sophisticated lender who has experience as a secured creditor in the telecommunications field. Throughout COI's relationship with DCA, Thermo Credit was getting paid every month—from March 2012 to October 2014, COI paid Thermo Credit $636,212. Forcing DCA to terminate the relationship, or significantly lower the payments it received from COI, could have put COI's monthly payments to Thermo Credit at risk. So Thermo Credit approved the payments, continued to get paid, and now seeks to recover the payments as "fraudulent transfers." Perhaps Thermo Credit did not fully grasp how wide the gap was between the value of COI's remaining assets and the balance of its outstanding debt; once it realized that foreclosing on COI's tangible assets still would not cover the full amount, it began scrambling for additional ways to obtain funds to pay the debt. But we decline to allow it to recover those payments when it had numerous opportunities to protect its interests, failed to do so, and prejudiced DCA by its failure to assert its rights.

VI.

Our holding today is narrow and heavily dependent on the facts and circumstances of this particular case. Here, Thermo Credit was a sophisticated lender with expertise in the telecommunications field that had a great deal of access to information about its debtor's finances, far more access than the average consumer or competitor. It made a calculated decision to approve a series of payments its debtor made to another company, all the while benefitting from the work the other company was doing, since the debtor was able to make its monthly payments. Now, it

seeks to recover those payments even though it had every opportunity to stop them, lower them, or foreclose on its debtor's assets. In these circumstances, we find that Thermo Credit waived its claim that the payments were fraudulent transfers. We therefore affirm the judgment of the district court.