ORDER AND JUDGMENT *
DAVID M. EBEL, Circuit Judge.
Plaintiff-Appellant Mathew Chalker appeals the district court’s entry of judgment based on the administrative record in favor of Defendants-Appellees Raytheon and Metropolitan Life Insurance Company (“MetLife”). This case arises out of Chalker’s allegation that Defendants wrongfully terminated his long-term disability benefits under the Employee Retirement Income Security Act (“ERISA”), 29 U.S.C. § 1132. The district court disposed of Chalker’s claims on two grounds: (1) Chalker’s suit was time-barred by a one-year contractual limitations period contained in the company’s Long-Term Disability Plan (“the Plan”), and (2) even if Chalker’s suit were not time-barred, Met-Life’s decision to terminate Chalker’s benefits was not arbitrary and capricious. Chalker now appeals. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM.
I. BACKGROUND
From 1977 until 2000, Chalker was employed in Raytheon’s Human Resources Department, eventually serving as the Department’s Senior Manager. While with Raytheon, Chalker participated in the Plan. The Plan is sponsored and administered by Raytheon, while MetLife is the long-term disability (“LTD”) claims administrator. As the LTD claims administrator, MetLife determines “all claims for [bjenefits and questions which may arise under the Plan "with respect to the payment of [bjenefits.... ” The Plan specifically provides that these decisions “shall be conclusive and binding on all persons, unless a court of competent jurisdiction *140 determines that [MetLife’s] decision was arbitrary or capricious.” MetLife has no financial obligations under the Plan, which is funded exclusively by Raytheon employees.
As provided for in the Plan, an individual is considered disabled “for the first 15 months [he] is receiving LTD benefits if [he is] unable to perform the essential elements of [his] job with reasonable accommodation.” Once this 15-month period has expired, an individual continues to be eligible for LTD benefits only if he is “unable to work at any job for which [he is] reasonably qualified by training, education or experience....” While receiving benefits, an individual may be asked to “provide proof of [a] continued disability.”
Individuals who believe they have been wrongfully denied benefits under the Plan may commence civil actions after exhausting a number of administrative remedies. However,
no action at law or in equity shall be brought to recover Benefits under the Plan prior to expiration of sixty (60) days after a claim has been filed in accordance with the requirements of the Plan, nor shall an action be brought at all unless within one (1) year after expiration of the time permitted under the Plan for furnishing proof of disability to the Claims Administrator.
This information is not contained in the Summary Plan Description (“SPD”).
In November of 2000, Chalker became unable to continue his employment with Raytheon due to a variety of medical difficulties. Chalker thereafter requested LTD benefits; MetLife initially approved those benefits in February of 2001. At this time, Chalker was diagnosed with major depressive disorder, generalized anxiety disorder, and fibromyalgia.
Over the next year, Chalker’s condition showed little improvement. In May of 2002, Katherine Thompson, Chalker’s clinical nurse specialist, asserted that Chalker was “not anywhere [near] ready to [return to work] due to his physical condition....” Similarly, in December of that same year, Dr. McBride, Chalker’s treating physician, asserted that Chalker’s “physical abilities are poor but improving languidly. At this time, [Chalker] cannot perform any job.” Eight months later, in August of 2003, Chalker’s condition still had not improved. To that effect, Dr. Jepson, Chalker’s subsequent treating physician, noted that Chalker could not “perform any activity for more than 5-10 minutes” and was to “avoid completely” standing, sitting, or reaching, among other activities. Based on such concerns, MetLife continued Chalker’s LTD benefits.
Some time later, in February of 2004, Chalker underwent a Facility Capacity Evaluation (“FCE”) at MetLife’s direction. As part of the FCE, Chalker was asked to perform 21 different physical tasks, including pushing, pulling, and sitting. According to John Michael Orr, the FCE administrator, Chalker “participated fully in 2 out of 21 tasks ... and demonstrated self-limiting participation by stopping tasks early due only to reasons of pain on 19 out of 21 tasks....”
Based on Chalker’s performance during the FCE, Orr opined that Chalker was “capable of performing physical work at the Light level, as defined by the U.S. Department of Labor.... ” Orr further noted that “[t]his overall level of work is merely a guideline, if accommodations are made based on the specific abilities and tolerances demonstrated, other levels of work may be feasible.” Nevertheless, Orr concluded that “[g]iven [Chalker’s] tendency toward self-limiting physical demands secondary to increasing pain levels and his *141 reduced position tolerances for sustained sitting and standing, it [was] difficult to predict whether Mr. Chalker could maintain the Sedentary level of work for the 8-hour day.”
Orr’s basic conclusions were supported by Dr. Tracey Schmidt, an independent physician consultant (“IPC”) to whom Met-Life provided the results of Chalker’s FCE. According to a report prepared by Dr. Schmidt, who is Board Certified in Internal Medicine and Rheumatology, Chalker
was given a light work capacity [on the FCE] due to significant self-limiting behavior. Therefore, this represents a minimum, not a maximum, work capacity.... By self-limiting on the FCE, no maximum work capacity could be ascertained, but there was no objective evidence [Chalker] would be unable to work in a light capacity on a full-time basis.
On the heels of Dr. Schmidt’s report, in May of 2004, MetLife obtained an Employ-ability Assessment and Labor Market Analysis regarding Chalker. This analysis concluded that “Chalker possesse[d] transferable skills and aptitudes and temperaments for other occupations” and that “3 [such] potential occupations for which Mr. Chalker [was] qualified” existed in his geographic area. Each of these potential occupations required a light level of physical exertion and involved managerial responsibilities.
In light of the Employability Assessment and Labor Market Analysis, in June of 2004, MetLife informed Chalker that “[b]ased upon a thorough and extensive review and evaluation of all the medical information submitted by [Chalker], [his] physicians, and all the documentation contained in [Chalker’s] claim file,” Chalker no longer qualified for LTD benefits under the Plan. In reaching this decision, Met-Life cited the FCE, Dr. Schmidt’s report, and the Employability Assessment and Labor Market Analysis. MetLife’s letter concluded that
in view of the above, we have determined that the medical evidence submitted does not support the existence of a totally disabling condition preventing you from performing any and all occupations for which you are reasonably qualified .... Therefore, under the terms of the Plan, we have no alternative but to terminate your benefits effective May 28, 2004.
In July of 2004, Chalker appealed Met-Life’s decision. According to Chalker, “[a] significant portion of the medical evidence was left out of [his] file and was not considered during the first review, which led to an incorrect conclusion about [his] disability.” Chief among this evidence according to Chalker was a Statement of Functional Capacity (“SFC”) completed by Dr. Jepson, asserting that Chalker was “ ‘totally disabled for any occupation for an indefinite period of time.’ ” Chalker also offered letters from Drs. Jepson and McBride indicating that he was totally disabled and unable to perform any job. Dr. Jepson’s letter specifically took issue with the FCE:
With regard to [Chalker’s] functional capacity evaluation on February 5, 2004, I think MetLife should be aware that he suffered for several days with a post-activity spasm pain known as “after discharge” pain. He was in bed for several days afterwards. During the evaluation itself he had to rest in a combination of lying down and sitting for about 120 minutes. He was only able to perform activities for about 60 minutes. Therefore, it seems impossible that [Chalker] would be able to work eight hours each day, five days a week.
*142 Thus, Dr. Jepson opined that Chalker was “completely and permanently disabled from any occupation....”
Following its receipt of Chalker’s appeal, in August of 2004, MetLife obtained an additional report from another IPC, Dr. Elinor Mody (who like Dr. Schmidt, is Board Certified in Internal Medicine and Rheumatology). According to Dr. Mody’s report, she had a telephone conversation with Dr. McBride, in which Dr. McBride allegedly asserted that “Chalker had no inflamed joints and all of his disabling diagnosis were subjective. Mr. Chalker has improved quite a bit on medication. He can now walk down the stairs without difficulty; initially he would not even leave the bed.” In light these remarks and the additional information contained in the various reports concerning Chalker, Dr. Mody concluded that “[tjhere is no clear medical evidence in terms of [Chalker’s] physical health to support recommending against all work. Mr. Chalker has, again, no abnormal joint findings and no significant cardiovascular disease that has been documented. Therefore, there are no obvious adverse consequences that come to mind from performing a sedentary job.” Thus, although Dr. Mody agreed with the FCE and Dr. Schmidt that Chalker was capable of some level of work, she believed this work could be at the sedentary level.
In light of Dr. Mody’s conclusion that Chalker was capable of sedentary work as opposed to light level work, in September of 2004, MetLife obtained a new Employability Assessment and Labor Market Analysis for Chalker. This analysis concluded that there were four available positions involving sedentary work for which Chalk-er was qualified. Based on Dr. Mody’s report, as well as the updated Employability Assessment and Labor Market Analysis, MetLife denied Chalker’s appeal on October 5, 2004.
In denying Chalker’s appeal, MetLife was dismissive of Dr. Jepson’s SFC because Dr. Jepson “did not provide office notes or physical exam findings. In addition, Dr. Jepson did not comment on [Dr. Schmidt’s report].... ” Additionally, in order to support its decision, MetLife cited Dr. Mody’s report, noting that Dr. Mody had spoken with Dr. McBride, and concluded that “there [was] no clear medical evidence in terms of [Chalker’s] physical health to support recommending against all work.” Lastly, MetLife cited a September 2004 report from a psychiatrist, Dr. Reginald Givens, that concluded “there is not clear medical evidence to support a psychiatric condition that would prevent [Chalker] from all work.”
On October 21, 2005, over a year after MetLife denied Chalker’s appeal, Chalker sued Defendants, asserting that he was improperly denied LTD benefits under the Plan. Defendants filed a motion for judgment on the administrative record. The district court granted this motion, concluding that Chalker’s claim was time-barred because he did not file his civil action within the one year contractual limitations provision contained in the Plan. Alternatively, the district court asserted that even if Chalker’s claim were not time-barred, Chalker had not shown that MetLife’s decision to deny him LTD benefits was arbitrary and capricious. Chalker now appeals.
II. DISCUSSION
Because we believe this case can be readily decided on the merits, we need not consider whether Chalker’s civil action is barred by the Plan’s contractual limitations provision, and we instead focus our analysis exclusively on whether MetLife’s decision to terminate Chalker’s benefits was arbitrary and capricious.
*143 A. Standard of Review
The Plan grants MetLife discretionary authority to determine eligibility for LTD benefits.[1] Therefore, we agree with the district court that MetLife’s decision should be reviewed under the arbitrary and capricious standard. See Gaither v. Aetna Life Ins. Co., 388 F.3d 759, 767 (10th Cir.2004). And “[because [Chalker] has not raised the issue of a potential conflict of interest warranting an enhanced standard of review, we assume that the pure arbitrary and capricious standard applies.” Buckardt v. Albertson’s, Inc., 221 Fed.Appx. 730, 734 (10th Cir.2007) (unpublished) (citing Fought v. UNUM Life Ins. Co. of Am., 379 F.3d 997, 1003 (10th Cir. 2004)).
“The district court’s determination of whether a plan administrator’s decision is arbitrary and capricious is a legal conclusion subject to de novo review.” Rekstad v. U.S. Bancorp, 451 F.3d 1114, 1119 (10th Cir.2006). “Indicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary.” Caldwell v. Life Ins. Co. of N. Am., 287 F.3d 1276, 1282 (10th Cir.2002). “Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker.” Id. (alteration, quotations omitted). “Substantial evidences requires more than a scintilla but less than a preponderance.” Sandoval v. Aetna Life & Cas. Ins. Co., 967 F.2d 377, 382 (10th Cir.1992) (quotation omitted).
“When reviewing [MetLife’s decision] under the arbitrary and capricious standard, [MetLife’s] decision need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within [its] knowledge to counter a claim that it was arbitrary or capricious.” Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir.1999) (alterations, quotations omitted). With this in mind, “[t]he decision will be upheld unless it is not grounded on any reasonable basis.” Id. (quotation omitted).
B. Chalker’s Arguments
Chalker briefly advances several arguments in an effort to prove that MetLife’s decision was arbitrary and capricious. We consider each in turn.
1. MetLife did not consider information provided by Chalker’s treating physicians
Chalker’s argument that MetLife failed to consider information provided by his treating physicians is unavailing. There is no evidence in the record suggesting that MetLife ignored the reports of Drs. McBride and Jepson; indeed, the evidence is to the contrary. MetLife consistently provided the reports of Drs. McBride and Jepson to the IPCs who independently evaluated Chalker’s condition. Although Chalker may disagree with the analysis of the IPCs, there is simply no evidence that MetLife failed to consider the materials provided by his treating physicians.
As the Supreme Court indicated in Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003):
Plan administrators, of course, may not arbitrarily refuse to credit a claimant’s reliable evidence, including the opinions of a treating physician. But, we hold, courts have no warrant to require ad *144 ministrators automatically to accord special weight to the opinions of a claimant’s physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician’s evaluation.
Thus, it was not arbitrary and capricious for MetLife to credit the reports of the two IPCs rather than the reports of Drs. McBride and Jepson; MetLife did not owe the opinions of Drs. McBride and Jepson any special deference. Meraou v. Williams Co. Long Term Disability Plan, 221 Fed.Appx. 696, 702 (10th Cir.2007) (unpublished opinion) (asserting that “[i]n ERISA cases no special deference is due the opinion of the claimant’s treating physician.”).
2. MetLife relied upon a flawed and inconsistent FCE
Chalker also asserts that numerous flaws with the FCE rob it of any utility in assessing whether he ought to receive LTD benefits. In Buckardt, 221 Fed. Appx. at 736, this court considered the utility of FCEs that “contain[ed] some contradictory findings.... ” At issue there were FCEs that asserted the claimant
had to change postures frequently during the evaluation, experienced high pain levels at certain times during the testing, reported difficulty sitting, standing, walking, and lifting, and reported pain that prevented her from hobbies, sports, sexual relations, chores, and work. However, despite noting these difficulties, both [FCEs] ultimately concluded that [the claimant] was capable of modified sedentary work.
Id. Despite these contradictory findings, this court nevertheless asserted that the administrator could rely on the FCEs, as under the arbitrary and capricious standard of review, ‘“[t]he Administrator's] decision need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within [his] knowledge to counter a claim that it was arbitrary and capricious.’” Id. (quoting Kimber, 196 F.3d at 1098.)
The same notion rings true in this case. Although there may well be some flaws with the FCE, it is not so flawed that it could not have provided MetLife with any reasonable basis to terminate Chalker’s LTD benefits. That is, the evidence is of the sort that “a reasonable mind could accept as sufficient.” Adamson v. UNUM Life Ins. Co. of Am., 455 F.3d 1209, 1212 (10th Cir.2006).
3. MetLife relied upon the opinions of IPCs whose qualifications with respect to fibromyalgia were not established
Next, Chalker contends that the qualifications of Drs. Schmidt and Mody with respect to fibromyalgia were not established. Drs. Schmidt and Mody, however, are both Board Certified in Rheumatology; “rheumatology is the relevant specialty for fibromyalgia.” Howell v. Astrue, 248 Fed.Appx. 797, 798 (9th Cir.2007) (unpublished). Nevertheless, Chalker contends that “[although fibromyalgia may generally be included within the field of rheumatology, that does not mean all rheumatologists are qualified to handle fibromyalgia cases.”
While it is no doubt true that some rheumatologists have more expertise in fibromyalgia than others, it cannot be said that MetLife’s reliance on the opinions of two independent, board certified rheumatologists was arbitrary and capricious. Although MetLife may have been better served by finding rheumatologists with fibromyalgia specialties, it cannot be concluded that doing so was required under the arbitrary and capricious standard of review. Again, the opinions of Drs. Mody *145 and Schmidt, provided evidence of the sort that “a reasonable mind could accept as sufficient.” Adamson, 455 F.3d at 1212.
4. Defendants relied upon the opinions of IPCs who disagreed
Next, Chalker points out that Drs. Mody and Schmidt disagreed regarding the level of work he was capable of performing. In this respect, Dr. Mody concluded that Chalker was capable of sedentary work, while Dr. Schmidt concluded that Chalker was capable of light level work. This disagreement, however, is of no aid to Chalk-er’s claim. While Drs. Mody and Schmidt may have disagreed about the level of work Chalker was capable of, they did not disagree that Chalker was capable of performing some level of work. And whether that work be at a sedentary or light level is immaterial in deciding whether MetLife arbitrarily and capriciously denied Chalker LTD benefits.
5. Defendants failed to consider Chalk-er’s medication/pain/or other circumstantial evidence in determining whether he was disabled
Finally, Chalker asserts, without elaborating, that MetLife ignored Chalker’s medication schedule, constant pain, and “other circumstantial evidence” in concluding that he was no longer qualified for LTD benefits. Because Chalker does not extrapolate on these arguments, it is difficult to determine his precise claims. In any case, the arguments are of no aid to Chalker in surmounting the arbitrary and capricious standard of review.
Again, the question for this court is not whether MetLife made the “correct” decision in terminating Chalker’s LTD benefits. Instead, the question is whether MetLife had a reasonable basis for the decision that it made. We are confident that it did. In determining that Chalker was not qualified for LTD benefits, MetLife relied on the evaluations of two independent, board certified rheumatologists as well as the independent FCE, all of which suggested that Chalker could perform some level of work. While Chalker may be able to dispute this evidence, he cannot contradict it to such an extent that it can be said MetLife’s decision was arbitrary and capricious.
III. CONCLUSION
Based on the foregoing, the judgment of the district court is AFFIRMED.

 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R.App. P. 32.1 and 10th Cir. R. 32.1.

. In this regard, the Plan provides that ‘‘[t]he decisions of the Claims Administrator shall be conclusive and binding on all persons, unless a court of competent jurisdiction determines that such decision was arbitrary and capricious.”