RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0173p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

JERRY ENGLESON,

       *Plaintiff-Appellant*,

    *v.*

No. 12-4049

UNUM LIFE INSURANCE COMPANY OF
AMERICA; SEIBERT KECK LONG TERM
DISABILITY INCOME PLAN,

         *Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 5:09-cv-02969—David D. Dowd, Jr., District Judge.

Argued: May 1, 2013

Decided and Filed: July 3, 2013

Before: MERRITT, CLAY, and DONALD, Circuit Judges.

───────────────

**COUNSEL**

**ARGUED:** Kenneth L. Gibson, GIBSON & LOWRY, Cuyahoga Falls, Ohio, for
Appellant. Brett K. Bacon, FRANTZ WARD LLP, Cleveland, Ohio, for Appellees.
**ON BRIEF:** Kenneth L. Gibson, GIBSON & LOWRY, Cuyahoga Falls, Ohio, for
Appellant. Brett K. Bacon, Olivia Lin Southam, FRANTZ WARD LLP, Cleveland,
Ohio, for Appellees.

───────────────

**OPINION**

───────────────

    BERNICE BOUIE DONALD, Circuit Judge. Jerry Engleson waited over eight
years before seeking judicial review of his denied claim for long-term disability benefits.
The terms of his disability plan, however, gave him a little more than three years to file
such a suit. Despite Engleson's best efforts to convince us otherwise, neither the law nor

principles of equity allow us to excuse the tardiness of his suit.  As a result, we **AFFIRM** the decision of the district court**.**

I.

Jerry Engleson was a Vice President at the Seibert-Keck Insurance Agency in Akron, Ohio.  His responsibilities included managing the company's casualty and property insurance lines.  He suffered from a number of medical conditions, including Crohn's disease and depression.  Eventually, the maladies proved to be too much; he stepped down from his position on June 16, 2001, citing his impaired state.

Seibert-Keck had a group plan for long-term disability benefits, managed by the Unum Life Insurance Company of America (Unum).  Upon his departure from Seibert-Keck, Engleson filed a claim for long-term disability benefits under this plan.  He then moved to Sarasota, Florida.

Unum denied his claim on August 22, 2001, reasoning that Engleson's clinical documentation did not support his assertion that his symptoms were so debilitating that he was precluded from working.  From Unum's perspective, nothing in the file suggested that Engleson had been "continuously disabled."

But Unum also offered an internal appeal, which Engleson took advantage of on August 28, 2001.  In doing so, he asked for his claim file, stating: "I would appreciate it very much if you would provide me with the documents contained in your claim file which were pertinent to your denial decision."  Unum sent the file.

Engleson had no luck with the appeal; Unum denied it on October 10, 2001.  Unum offered another opportunity for further review, which Engleson decided to take up.  This time, he asked his treating physician in Ohio to submit additional supporting information on his behalf.  When Unum received this information, Engleson lodged another internal appeal.

Engleson's second appeal met a similar fate as his first—Unum denied the subsequent appeal on November 29, 2001.  After an on-site physician reviewed the new

information, Unum concluded that the additional medical information "[did] not provide a sufficient basis to reverse the denial of benefits."

Over the next few years, Engleson fell silent with respect to his unsuccessful claim. By 2007, he had returned to Ohio and to Seibert-Keck. But by August 1, 2008, his medical condition became too much to bear once more—Engleson filed another claim for disability benefits on that day, claiming that he was unable to work as of the day before. This time, Unum granted his request, awarding benefits in a letter dated December 23, 2008, with the date of disability denoted as August 5, 2008. Unum acknowledged the 2001 claim, but cautioned that it was "unable to overturn a disability claim decision where 2 appeals [had] been clearly made and upheld." Its letter further provided that: "If you or your physician(s) have additional information to support your request for disability benefits based upon an earlier date of disability, we will be happy to reconsider your claim."

Engleson wrote back that he was "somewhat disappointed that UNUM [had] chosen to use August 5, 2008 as the date of disability." He asked what additional information the company might need to reconsider his 2001 claim. Unum responded by noting that it "already afforded [Engleson] two appeal reviews relevant to an earlier period of loss dating back to 2001" and that it would "not be completing an additional appeal review" as a result.

Engleson, undeterred, filed suit in district court on December 22, 2009, seeking the recovery of wrongfully denied benefits pursuant to 29 U.S.C. § 1132(a)(1)(B) and section 502(a) of the Employee Retirement Income Security Act (ERISA). He also sought equitable relief, alleging that he was not afforded a full and fair review of his claim under 29 U.S.C. § 1133 and that Unum breached its fiduciary duties under the terms of the plan.

On July 13, 2010, the magistrate judge ordered the parties to brief the issue of whether Engleson's suit was timely. After the briefs were filed, the district court held an evidentiary hearing. Determining that the three-year contractual limitations period barred the suit, the district court dismissed the case on June 29, 2012. It explained that,

under the plan's provisions, Engleson had until March 12, 2005 to file a legal action with respect to his 2001 claim.[1]   As the suit was filed in 2009, it was deemed untimely. Engleson appealed.

## II.

We begin with a somewhat technical point that was not raised by either party, but one that has a bearing on how we view this case.  The district court dismissed the case pursuant to Rule 12(b)(6), positing that its decision was premised on Engleson's pleadings and attachments thereto.  That rule, however, "is generally an inappropriate vehicle for dismissing a claim based upon a statute of limitations." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012).

When a district court "considers matters outside the pleadings in a Rule 12(b)(6) motion" and issues "the functional equivalent of a Rule 56 ruling," we may treat the Rule 12 dismissal as a grant of summary judgment in the movant's favor.  *See Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 487-88 (6th Cir. 2009); *see also Brigolin v. Blue Cross Blue Shield of Mich.*, No. 11-1525, 2013 WL 781639, at *2 (6th Cir. Mar. 4, 2013) (explaining that, when district courts fail to convert a Rule 12(b)(6) motion to a motion for summary judgment when the circumstances warrant it, this court may "ignore the label attached to the proceeding and properly treat it as one for summary judgment").  Here, the proceedings leading up to the district court's decision give the impression that the decision was the "functional equivalent" of summary judgment in the guise of a Rule 12(b)(6) decision.

Take, for example, the fact that the parties filed briefs on the limitations issue and attached extrinsic evidence to such briefs.  Add to that the district court's evidentiary hearing on the limitations issue.  Both suggest that the district court "considered" extrinsic evidence in dismissing the claim on limitations grounds.  While it may be true

---

[1] The plan requires participants to file an ERISA claim within "3 years after the time proof of claim is required."  As the district court explained, Engleson's disability began on June 15, 2001.  His three-year limitations period began running 270 days after the date of disability, meaning the clock started ticking on March 12, 2002.

that the district court's opinion did not refer to any extrinsic evidence, the court's analysis of the contractual limitations clause was rather threadbare. Given the extensive appendices filed by both parties on appeal and our reliance on the evidence contained therein in our consideration of Engleson's arguments, we find it difficult to believe that the district court's decision could be sustained on the pleadings alone.

Accordingly, as the district court's decision was the "functional equivalent" of a Rule 56 ruling, we will treat it as such. *See Tackett*, 561 F.3d at 488. We review a district court's grant of summary judgment *de novo*. *Price v. Bd. of Trs. of Ind. Laborer's Pension Fund*, 707 F.3d 647, 650 (6th Cir. 2013). "Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Id.* (quoting *Price v. Bd. of Trs. of Ind. Laborer's Pension Fund*, 632 F.3d 288, 291-92 (6th Cir. 2011)).

Engleson raises three arguments in his attempt to stave off enforcement of the contractual limitations period. First, he asserts that Unum violated three ERISA regulations. Second, he claims Unum waived its contractual limitations defense in its 2008 correspondence. Finally, Engleson contends he is entitled to equitable tolling of the limitations period. We discuss these arguments in turn.

### III.

Engleson first points to three alleged violations of ERISA regulations: two arising from the content of Unum's adverse benefit determinations, the other from Unum's summary plan description. We discern no violation arising from any of these rules.

### A.

The 2000 edition of the Code of Federal Regulations provides, in pertinent part:

> (f) *Content of notice*. A plan administrator . . . shall provide to every claimant who is denied a claim for benefits written notice setting forth in a manner calculated to be understood by the claimant:

. . .

> (4) Appropriate information as to the steps to be taken if the participant
> or beneficiary wishes to submit his or her claim for review.

29 C.F.R. § 2560.503-1(f) (2000).  Engleson contends that, under this provision, Unum was required to disclose his right to seek review in federal court and the contractual time limitation attached to that right in its claim denial letters.  To support his argument, Engleson points to persuasive authority provided by two of our sister circuits in *Chappel v. Laboratory Corp. of America*, 232 F.3d 719 (9th Cir. 2000) and *White v. Sun Life Assurance Co. of Canada*, 488 F.3d 240 (4th Cir. 2007).

We construe the phrase "appropriate information" as requiring only the disclosure of information pertaining to *internal* processes, not judicial review.  In doing so, we first look to the statutory origins of the rule:  29 U.S.C. § 1133.  *See VanderKlok v. Provident Life and Accident Ins. Co.*, 956 F.2d 610, 615 (6th Cir. 1992) (explaining that the notice provisions were "regulations promulgated under section 1133").  Section 1133 is a statute with a two-fold purpose:  "(1) to notify the claimant of the specific reasons for a claim denial, and (2) to provide the claimant an opportunity to have that decision *reviewed by the fiduciary*."  *Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 501 (6th Cir. 2010) (emphasis added) (quoting *Wenner v. Sun Life Assurance Co. of Can.*, 482 F.3d 878, 882 (6th Cir. 2007)); *see also* 29 U.S.C. § 1133 (2000) ("[E]very employee benefit plan shall . . . afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review *by the appropriately named fiduciary* of the decision denying the claim." (emphasis added)).  Given that the enabling statute addresses internal appeals, we are reluctant to construe the phrase "appropriate information" as requiring disclosure of pertinent information regarding *both* internal appeals and judicial review.

Nothing in *Chappel* or *White* compels us to conclude otherwise.  To the contrary, both cases undermine Engleson's argument in some way.  Consider *Chappel*, for instance.  There, a plan administrator denied a disability benefit, but in doing so, failed to disclose the plan's arbitration requirement and the attendant 60-day window for filing

a request for arbitration. *See Chappel*, 232 F.3d at 722-23. As Engleson correctly points out, the Ninth Circuit concluded that the plan administrator's failure to disclose constituted a breach of fiduciary duty. *Id.* at 727. The court highlighted the obligation of ERISA fiduciaries to act "solely in the interests of the participants and beneficiaries" when writing and implementing an arbitration clause. *Id.* at 726. It went on to suggest that the administrator's failure to disclose the short temporal window for arbitral review—and the accompanying forfeiture of further review if the beneficiary failed to engage in arbitration—was unreasonable. *See id.* at 726-27.

The court made clear, however, that such a disclosure was not compelled by section 2560.503-1(f) of the Code of Federal Regulations. *See id.* at 726 ("Neither 29 U.S.C. § 1133 nor its implementing regulations are directly applicable here; they address only *a plan's internal appeal process . . . .*" (emphasis added)). Instead, it used the rule as a means of illustrating a fiduciary duty to disclose in cases where arbitration was mandated by the plan. *See id.* ("Just as a fiduciary must give written notice to a plan participant or beneficiary of the 'steps to be taken' to obtain *internal review* when it denies a claim, so also, we believe, should a fiduciary give written notice of steps to be taken to obtain external review *through mandatory arbitration* when it denies an internal appeal." (emphases added and citation omitted)).

It is true that mandatory arbitration, like judicial review, is an "additional step in the plan's claim procedure . . . [and] to some degree, a substitute for judicial review." *Id.* Therefore, we understand why Engleson would ask for an extension of *Chappel*'s reasoning to include judicial review. But the Ninth Circuit's decision was prompted in part by *who* was imposing the additional layer of review. Mandatory arbitration is a requirement wholly fashioned by the plan administrator; as the decision to impose arbitration is entirely within the fiduciary's control, the administrator must take care in enforcing the requirement. Indeed, the *Chappel* court could relate mandatory arbitration to section 2560.503-1(f) *precisely* because the arbitration requirement was internally imposed and the regulation only dealt with internal processes.

Judicial review, on the other hand, is an externally-imposed creature—mandated by statute, not by contract. *See* 29 U.S.C. § 1132. Based on this distinction, we conclude that *Chappel*'s reasoning is incompatible with Engleson's interpretation of what the phrase "appropriate information" requires.

Engleson's argument fares no better with the Fourth Circuit's decision in *White*. At first glance, it appears the decision might save his claim. In a footnote, the court opined:

> The symbiotic nature of ERISA remedies is also evident in regulations concerning the notice that ERISA plans must provide to claimants upon denial of benefit claims as part of the plan's obligations with respect to "full and fair review." The civil action is treated as an integral part of this review: plans are directed to include a "description of the plan's review procedures and the time limits applicable to such procedures, *including a statement of the claimant's right to bring a civil action*" following an adverse benefits determination.

*White*, 488 F.3d at 247 n.2 (quoting 29 C.F.R. § 2560.503-1(g)(iv)) (emphasis in original). This passage seems to suggest that the scope of § 1133 and the notice derived therefrom includes *both* internal and judicial mechanisms for review. The *White* decision, however, leads to a dead end: it cites the current rule in place, not the 2000 regulation at issue here.

Engleson suffers from unfortunate timing, apparently in more ways than one. Had these events transpired a year later, he would have a colorable ERISA violation. But the civil action notice was not required until 2002, having been enacted in 2000. *See* 29 C.F.R. § 2560.503-1(o) (2001) (indicating that the regulations would take effect on January 1, 2002). *Compare* 29 C.F.R. § 2560.503-1(f)(4) (2000) (requiring "[a]ppropriate information as to the steps to be taken if the participant . . . wishes to submit his . . . claim for review"), *with* 29 C.F.R. § 2560.503-1(g)(1)(iv) (2001) (requiring plans to include "a description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action" to challenge adverse benefit determinations). As a result, the *White* court's commentary on the "symbiotic nature" of ERISA remedies provides us with little

to no guidance.  We conclude that Unum was under no regulatory obligation in 2001 to disclose either Engleson's right to pursue litigation in federal court or the limited window for obtaining such review in its claim denial letter.

### B.

Not only does Engleson find flaws in how Unum issued its claim denial letters, he also takes issue with how Unum *granted* benefits.  He argues that the 2008 letter granting him disability benefits constitutes (1) an adverse benefit determination and (2) waiver as a matter of law.  Because Unum denied the backdating of his 2008 benefits, Engleson construes the 2008 letter as an adverse benefit determination.  As such, the letter—according to Engleson—needed to disclose the "specific reason or reasons for the adverse determination."  *See* 29 C.F.R. § 2560.503-1(g)(1)(I) (2008).  Because Unum failed to do so, Engleson argues, the violation excuses his tardy suit and waives Unum's ability to enforce the contractual limitations provision.

We are unconvinced for two reasons.  First, Engleson's 2001 application for disability benefits and his 2008 application for disability benefits were two separate claims.  Unum treated the requests as such, assigning the latter claim a wholly different case number.  The two could not be reasonably construed as one continuing claim, as the 2008 claim does not refer to its predecessor.  Engleson made no mention of the 2001 claim until Unum acknowledged it—*after* the benefits determination had been made.  In short, we fail to see any lasting connection between the two claims that would lead us to construe the 2008 letter as a denial of the 2001 claim.

Second, even assuming that we accept Engleson's argument that either the 2008 grant-of-benefits letter or the 2009 letter refusing another internal appeal constituted an adverse benefit determination as to the 2001 claim, we note that this would have been the *fourth* instance in which the earlier claim had been evaluated by the plan.  When an adverse benefit determination is justified in the first instance and later denials are premised on the initial reason, there has been a "full and fair review" that satisfies § 1133 and its regulations.  *See Brimer v. Life Ins. Co. of N. Am.*, 462 F. App'x 804, 808-09 (10th Cir. 2012).  Here, the plan initially provided a reason for denying Engleson's

benefits: neither his physical condition nor his depression seemed to impair his ability to work in 2001. The first internal appellate review maintained the denial of benefits on the same grounds. So did the second. Unum's letter of February 10, 2009, if construed as an adverse benefit determination, did not deviate from the initial reason offered for denying the claim. Hence, Unum had no need to repeat the specific reasons for declining to reconsider Engleson's appeal.

C.

We now address Engleson's contention that Unum's summary plan description (SPD) did not comply with section 2520.102-3(s) of the 2009 edition of the Code of Federal Regulations.[2] The rule reads, in pertinent part:

> The following information shall be included in the summary plan description of both employee welfare benefit plans and employee pension benefit plans
>
> . . .
>
> (s) The procedures governing claims for benefits (including procedures for obtaining preauthorizations, approvals, or utilization review decisions in the case of group health plan services or benefits, and procedures for filing claim forms, providing notifications of benefit determinations, and reviewing denied claims in the case of any plan), *applicable time limits*, and remedies available under the plan for the redress of claims which are denied in whole or in part (including procedures required under section 503 of Title I of the Act).

29 C.F.R. § 2520.102-3 (2009). Engleson contends that the phrase "applicable time limits" includes disclosure of contractual time limits for judicial review.

At least one district court in this circuit agrees with his view. *See Richards v. Johnson & Johnson*, 688 F. Supp. 2d 754, 779-80 (E.D. Tenn. 2010). So, too, does a circuit judge—albeit one from outside of this circuit, writing in dissent. *See Chalker v. Raytheon Co.*, 291 F. App'x 138, 149 (10th Cir. 2008) (Briscoe, J., dissenting).

---

[2]Engleson asserts that this alleged regulatory violation informs the equitable tolling analysis. We disagree, and discern no reason why his argument with respect to the inadequacy of the SPD should not be discretely evaluated.

Unfortunately for Engleson, however, we are unpersuaded by any of the rationales espoused in support of his position.

In *Richards*, the district court concluded that an SPD's silence as to the existence of a contractual limitations period created a direct conflict with the twelve-month limitations period denoted in the plan. *Richards*, 688 F. Supp. 2d at 779. It understood our decision in *Edwards v. State Farm Mutual Auto Insurance Co.*, 851 F.2d 134 (6th Cir. 1988), to suggest that "the terms of an SPD will control because it is unfair 'to publish and distribute a plan summary booklet designed to simplify and explain a voluminous and complex document and then proclaim that any inconsistencies will be governed by the plan.'" *Richards*, 688 F. Supp. 2d at 778 (quoting *Edwards*, 851 F.2d at 136). Because the SPD was silent, the court concluded that the state statute of limitations controlled. *See id.* at 780.

The persuasive value of *Richards*'s rationale has dramatically waned since the Supreme Court's decision in *CIGNA Corp. v. Amara*, 131 S. Ct. 1866 (2011). The *Amara* Court made clear that SPDs have a singular purpose: "clear, simple communication." *Amara*, 131 S. Ct. at 1877. Giving SPDs controlling weight, the Court reasoned, "could well lead plan administrators to sacrifice simplicity and comprehensibility in order to describe plan terms in the language of lawyers." *Id.* at 1877-78.

Since *Amara*, we have observed that SPDs are not "legally binding," nor "'parts' of the benefit plans themselves." *Moore v. Menasha Corp.*, 690 F.3d 444, 455-56 (6th Cir. 2012) (citing *Amara*, 131 S. Ct. at 1877-78). Because SPDs lack controlling effect in the face of plan language to the contrary, we do not feel compelled to read the regulation in a manner that requires sweeping, comprehensive disclosure, as Engleson asks us to do.

Further undermining the *Richards* rationale is our subsequent decision in *Lipker v. AK Steel Corp.*, 698 F.3d 923 (6th Cir. 2012). In *Lipker*, we held that "[s]ilence in the SPD regarding a term the plan defines more explicitly does not make out a 'conflict[,]'" *id.* at 931, contradicting one of the *Richards* court's foundational assumptions. The

*Lipker* court invoked the same concerns as the *Amara* Court in emphasizing the need to maintain the SPD's simplicity; it reiterated the "obvious" reality that "a summary will not include every detail of the thing it summarizes."  *Id.*  Our desire to maintain the "summary" characteristic of SPDs seems to militate against the *Richards* court's conclusion that the "applicable time limits" provision of section 2520.102-3(s) includes disclosure of contractual time limits on judicial review.

We now turn to Judge Briscoe's dissent in *Chalker*.  While her interpretation of the regulation is a reasonable one, it similarly appears to be incorrect.  Judge Briscoe understands the phrase "applicable time limits" as extending to "procedures governing claims for benefits," which sequentially precedes the time-limit phrase, as well as "remedies available under the plan," which is sequentially subsequent. *Chalker*, 291 F. App'x at 149 (Briscoe, J., dissenting).

But the last antecedent rule provides us with a different reading of the regulation. Under this interpretive canon, "a limiting clause or phrase . . . modifies only the noun or phrase that it immediately follows." *In re Sanders*, 551 F.3d 397, 399 (6th Cir. 2008) (modifications in original omitted).  With respect to section 2520.102-3(s), only "procedures governing claims for benefits" precedes the phrase "applicable time limits." Therefore, the general phrase "applicable time limits" extends only to the terms that precede it, i.e., time limits need only be disclosed with respect to the processing of claims.

Mindful of this interpretation, we conclude that Unum's SPD complied with the regulation. The SPD provided "applicable time limits" as to certain parts of the claims process, such as the plan administrator's obligation to provide a claim response within 90 to 180 days and the claimant's right to seek plan documents by filing suit in federal court after 30 days of noncompliance.  Unum complied with the requirement of disclosing the time limits for the "remedies available under the plan for the redress of claims" by (1) explaining the internal appeals process; and (2) noting the claimant's right to "file suit in a state or federal court" for claims that have been denied or ignored. Hence, we reject Engleson's contention that Unum violated section 2520.102-3(s).

IV.

Finding nothing in the ERISA regulations to excuse Engleson's tardiness, we now look to the common law.  Engleson argues that Unum waived its right to enforce the contractual limitations period in its 2008 correspondence.  Specifically, he points to language in Unum's letter of December 28, 2008, where it stated: "If you or your physician(s) have additional information to support your request for disability benefits based upon an earlier date of disability, we will be happy to reconsider your claim."

As there is no established federal common law in this circuit that governs the question of whether a plan administrator has affirmatively waived a contractual limitations provision, we "look to state-law principles for guidance."  *Tinsley v. Gen. Motors Corp.*, 227 F.3d 700, 704 (6th Cir. 2000).  While contractual limitations periods are generally enforced irrespective of state law so long as they are reasonable, *see Med. Mutual of Ohio v. k. Amalia Enters. Inc.*, 548 F.3d 383, 390-91 (6th Cir. 2008), the present case does not raise the question as to whether the period is *reasonable*, but whether the period was waived.

State insurance law is most analogous to ERISA; therefore, we look to Ohio insurance caselaw to determine whether Unum waived its contractual limitations defense.  Engleson recognizes that the biggest roadblock to his waiver argument is our past reliance on the Ohio Supreme Court's decision in *Hounshell v. American States Insurance Co.*, 424 N.E.2d 311, 314 (Ohio 1981).  Under *Hounshell*, "[a]n insurer . . . loses the right to assert its contractual statute of limitations if, 'by its actions or declarations, it evidences a recognition of liability under the policy, and the evidence reasonably shows that such expressed recognition of liability and offers of settlement have led the insured to delay in bringing an action on the insurance contract.'"  *Jackson v. State Farm Fire & Cas. Co.*, 461 F. App'x 422, 425-26 (6th Cir. 2012) (quoting *Klein v. State Farm Fire & Cas.*, 250 F. App'x 150, 155 (6th Cir. 2007)) (modifications in original omitted); *accord Hounshell*, 424 N.E.2d at 314.  An insurer's decision to reconsider the validity of a claim, however, "does not constitute a waiver of the

limitations clause." *Jackson*, 461 F. App'x at 425-26 (quoting *Hounshell*, 424 N.E.2d at 314).

In Engleson's view, the *Hounshell* test is not the only means by which a court can discern waiver under Ohio law. He refers us to the Ohio Supreme Court's decision in *Dominish v. Nationwide Insurance Co.*, 953 N.E.2d 820 (Ohio 2011), where the court noted that it did not "consider the [*Hounshell*] test to be the exclusive way to determine whether an insurance company has waived its right to enforce a limitation-of-action clause." *Id.* at 822. As an alternative test, Engleson offers up the generalized proposition that waiver is a "voluntary relinquishment of a known right." *See State ex rel. Wallace v. State Med. Bd. of Ohio*, 732 N.E.2d 960, 965 (Ohio 2000). But we need more than mere relinquishment—the waiver must be "a clear, unequivocal, and decisive act of the party against whom the waiver is asserted." *See Warmack v. Arnold*, 961 N.E.2d 1165, 1170 (Ohio Ct. App. 2011) (quoting *White Co. v. Canton Transp. Co.*, 2 N.E.2d 501, 505 (Ohio 1936)). Engleson's alternative test is more exacting than he portrays it.

Neither *Hounshell* nor the general waiver rule bodes well for Engleson's argument; in some sense, he has fashioned a choose-your-own-adventure for himself in which both choices lead to disappointment. Under the *Hounshell* test, his waiver argument is unavailing because Unum's December 2008 letter—if construed as an agreement to reconsider Engleson's 2001 claim denial—is mere reconsideration, not waiver. *See Jackson*, 461 F. App'x at 426. By proposing the alternative standard, Engleson indicates that he already knew his argument would be futile under *Hounshell*; therefore, we turn to the general waiver rule.

Even assuming *arguendo* that it is appropriate for us to consider the general waiver rule in attempting to discern a limitations waiver, Engleson's proposed standard is of no help here; the December 2008 letter lacks the clarity, directness, and decisiveness that the general waiver rule demands. As an initial matter, the letter is somewhat ambiguous as to *which* period may be reconsidered; it does not clarify whether it is referring to the 2001 or 2008 claim. Moreover, it is not entirely obvious

whether Unum agreed to take affirmative steps towards reconsideration—the correspondence merely suggested that Unum would be "happy to" reconsider upon submission of additional information, placing the ball in Engleson's court.  Finally, and perhaps more to the point, Unum's letter says nothing about waiving the limitations period.  Taking all this into consideration, Engleson's waiver argument fails even under his own standard.

V.

As nothing in the law excuses Engleson's tardiness, we now turn to his argument arising in equity.  He contends that he is entitled to equitable tolling and challenges the propriety of the district court's decision to apply the five-part equitable-tolling test of *Longazel v. Fort Dearborn Life Insurance Co.*, 363 F. App'x 365 (6th Cir. 2010), in denying his claim.

The "*Longazel* test"—which, in reality, reflects longstanding circuit precedent—consists of five considerations:  "(1) lack of actual notice of filing requirement; (2) lack of constructive knowledge of filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the defendant; and (5) a plaintiff's reasonableness in remaining ignorant of the notice requirement." *Id.* (quoting *Andrews v. Orr*, 851 F.2d 146, 151 (6th Cir. 1988)).  Instead of framing his arguments under this standard, Engleson argues that the Supreme Court's decision in *Amara* relaxed the standard for demonstrating equitable tolling in ERISA cases.

*Amara* is not the judicial panacea that Engleson thinks it is.  The Court's decision there did not address equitable tolling, and we can extrapolate nothing from it that disturbs our five-part test for equitable tolling in ERISA cases.  While Engleson correctly points out that the *Amara* Court discussed detrimental reliance and the relaxation of the requirement to show such reliance in seeking certain equitable remedies, our equitable tolling test does not require detrimental reliance, only reasonable ignorance.  *See Andrews*, 851 F.2d at 151.

So, mindful of the guideposts to our inquiry, we turn to the specific events that allegedly entitle Engleson to equitable tolling: Engleson never received any plan documents until shortly before litigation, and the plan administrator did not timely respond to his request for information. We conclude that Engleson was not diligent in pursuing his rights, thus failing under the fourth prong of our five-part test.

Consider the beneficiary in the First Circuit decision of *Ortega Candelaria v. Orthobiologics LLC*, 661 F.3d 675 (1st Cir. 2011). There, a plan participant requested a copy of the plan in 2000, well before suffering any disability. *Id.* at 677. At the time, the plan had no limitations period for filing suit. *Id.* The participant fell ill and filed for disability benefits in 2003, having suffered severe pain since the year before. *Id.* In 2004, while engaged in internal appeals with the plan administrator, the participant requested another copy of the plan—again, no limitations period had been imposed at this point. *Id.* A week after his second request for a copy of the plan, the plan was amended to include a one-year limitations period for pursuing civil actions. *Id.* The participant received no notice. *Id.* Later, the plan administrator denied the participant's appeal, failing to disclose information about judicial review or the new limitations period. *Id.* at 677-78.

Over three years later, the participant sought judicial review—like Engleson, he was under the impression that he had the full length of the state statute of limitations to file suit. *Id.* at 678. Citing the one-year contractual limitations period, the plan administrator claimed that the suit was untimely. *Id.*

The First Circuit disagreed, explaining that the limitations period was equitably tolled. It concluded that the administrator's failure to follow the disclosure regulations of section 2560.503-1(g)(1)(iv) constituted a material misleading on the part of the plan administrator. *Id.* at 680. In concluding that the participant was sufficiently diligent for equitable tolling, the court took special note of the participant's repeated requests for copies of the plan. *Id.* at 681.

We do not mean to suggest that a participant must replicate the exact series of unfortunate events that occurred in *Ortega Candelaria* in order to be entitled to equitable

tolling. But compare the *Ortega Candelaria* participant to Engleson—the former made repeated attempts to learn about the limitations period, while the latter did not request a copy of the plan documents until just prior to the commencement of litigation. Nothing in the record suggests Engleson made an attempt to obtain a copy of the plan before his disability or during the internal review processes. A plan participant that makes no effort to keep himself informed—even during internal review of his claim—can hardly assert that he was diligent in pursuing his benefits. Accordingly, we cannot conclude that Engleson is entitled to equitable tolling.

Engelson's argument that "UNUM failed to provide [him with] the pertinent documents which he requested in his letter of September 24, 2001" is similarly unavailing. In posing such a contention, Engleson provides us with some interesting logic: because the administrative record does not reflect whether Unum actually sent the contents of his claim file, Unum must have withheld information that was necessary for his appeal.

From the outset, we note that nothing in the record suggests bad faith on Unum's part. Instead, the record reflects that Unum provided Engelson with an administrative file in response to his request.

Under these circumstances, Unum had no burden to prove what was in the file. As equitable tolling is a defense to the assertion that a suit is out-of-time by statute or by contract, *see In re Maughan*, 340 F.3d 337, 344 (6th Cir. 2003), the burden of proving entitlement to such a defense falls to the party attempting to invoke it, i.e., Engelson, *see Robertson v. Simpson*, 624 F.3d 781, 784 (6th Cir. 2010). Unum is not the party invoking the defense of equitable tolling; therefore, it does not bear the burden of proving the contents of this file.

VI.

Engleson provides us with no valid basis—either in law or equity—that would allow us to excuse the tardiness of his suit. Accordingly, we **AFFIRM** the decision of the district court.